UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------- X

JASON P BRAND

                Plaintiff,       **Amended Complaint / Counter-defendant**

   -against-                      15-cv-06371 (JMA) (GRB)

PETERSON INTERNATIONAL UNDERWRITERS,
DISABILITY MANAGEMENT SERVICES
CERTAIN UNDERWRITERS AT LLOYDS OF
LONDON RE POLICY 1254480

                Defendants.

--------------------------------------- X

**F I L E D**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ MAR 11 2020 ★

LONG ISLAND OFFICE

RECEIVED
MAR 11 2020
EDNY PRO SE OFFICE

**INTRODUCTION**

1. Jason P Brand ("Brand") commenced this diversity action against Peterson International Underwriters, Inc. "PIU" s Disability Management Services "DMS", Certain Underwriters at Lloyds of London Re: Policy Number 125448.

2. The Plaintiff is seeking a declaratory judgment declaring that the policy issued by Certain Underwriters at Lloyds, Policy # 1254480 is valid and the benefits under such were due to him 90-days after he had submitted a Claim for disability benefits under the policy (the "Policy").

3. The Policy was placed in Force with an effective date of March 1st, 2012

4. The Policy of insurance issued, in which was issued by Peterson International Underwriters of behalf of Certain Interested Underwriters at Lloyds "Peterson" has/had been granted the contractual right and duty as a cover holder to bind "Certain Underwriters at Lloyds" "Lloyds" to the Long Term Disability policies in which one of such is

being litigated here.

5. As the Plaintiff will provide the court, a timeline of the underwriting and the application that was completed to obtain this policy.

6. The Lloyds Policy was being applied for and marketed as early as September 2011.

7. The proposed policy in which was eventually issued was offered to the Plaintiff on February 14, 2012. The terms were set forth in an email. The Application in which "LLOYD's" attaches to the policy was filled out after the policy was fully underwritten and accepted by the Plaintiff. (Exhibit E12)

8. The court will see from the communication provided in Exhibits E1-E15, in which Clearly shows the court how this Application was completed.

9. The Defendant "Lloyds" was placed on Notice of a claim for disability by their Agent in October 2014, regarding the Plaintiff.

10.                                    The policy is
    governed and issued through an excess line broker licensed
    in the State of New York, the policy is bond by the
    provisions and regulations of the New York State
    Department of Financial Services, in which New York
    Contract and Insurance law governs.

11.                                    The Plaintiff
    "Jason Brand" resides within the state of New York and
    entered this contract of insurance through E-Signature
    when he was located within the State of New York.

12.                                    In this action the
    "Peterson Policy" provided a Monthly Benefit amount of
    $10,800 a month for 60 (sixty Months) after a 90-day
    elimination (waiting) period. If the Plaintiff remained
    disabled as defined under the policy at the end of his 60
    months of benefits which would have terminated the
    beginning of this year, the policy pays an additional lump
    sum of $1,000,000 (1 Million) Dollars. The terms of such
    policy are annexed hereto this amended complaint. (Exhibit
    A)

13.    <u>JURISTICTION – 28 USC 1332</u>

14.            Lloyds is a London Insurance Exchange based in the U.K., **Ark Syndicate Management** in which has a subsidiary ARK Underwriting Inc are both London Company's (website, Public Financial Statement), with a Corporate Office located at 30 Fenchuirch Ave, EC3M 5AD, U.K., the complete Corporate Management team is based at that location. There is no New York presence directly.

      i. **Peterson International Underwriters**, Syndicate 4020's, cover-holder in "Brand's policy is a California Company, located at 23929 Valencia Blvd, Valencia, CA 91355, and all their Corporate Officers are domiciled in the state of CA. **Rampart Life, Rampart Agency, or Branca-Rampart** – is in the state of New Jersey. Rampart Brokerage, Charter Trade Credit, and the Producer Ilan D. Glenn are all based out of New Hyde Park, NY.

15.            The Policy was **issued and executed in the State of New York**, Stamped / Taxes Paid in the State of New York. Therefore, the policy is a New York State regulated Excess Line (Surplus Line) Life/Health/Disability policy governed under the laws of

New York.

16.          As per the Defendant(s), and by its policy
documents, the Law, and the representations of the
defense, Syndicate 4020 is the responsible party that has
been appointed to act for all syndicates. The defendant
has represented that the appropriate party in which this
action was commenced is the proper party to this diverse
defendant.

17.          I have agreed with counsel for defense to
dismiss the non-diverse parties to this action, in which
has been submitted and stipulated on this docket.

18.     (*At the time in which the subject policy was issued
and in effect, such policy itself contained no syndicates.
The policy was referred to by its agents as "The Peterson
Policy" or the "Lloyds" policy.)

19.          The defendant Certain Underwriters of
Lloyds can provide insurance in the United States through
a series of "middle-men"

20.          The Plaintiff was unaware of how the Lloyds

market worked and how these policies were drafted. The
Agent for Lloyds only referred to this policy as either
"The Peterson Policy" or "The Lloyds Policy."

21.          The Plaintiff like many unsophisticated
consumers rely upon licensed Agents representations when
they purchase a policy of insurance. to shop and precure
the proper coverage for your needs.

### i. THE LLOYDS MARKET / THE POLICY STRUCTURE

22.          Certain Underwriters at Lloyds is a
basically a Market (almost like a New York Stock Exchange)
that are composed of Individuals "names", and Syndicates
"a group of Names, usually in the form of a company".

23.          The "names" are simply investors who
subscribe to a syndicate.

24.          Each syndicate represents a bunch of names
that subscribe to certain risks.

25.          The "names" or the investors change all the
time, another wards a "name" who may have been part of a
syndicate when a risk or policy was underwritten may not

be the same "name" within the syndicate at the time a risk is triggered. (claim is made).

26.     Syndicates are foreign companies for the most part, that are incorporated all over the world, and these syndicates cannot directly market, sell, underwrite, manage, collect premium, and/or pay claims directly to a policy holder here in the United States.

27.     For Syndicates to invest in risks in this Country they must appoint US Based underwriter(s), otherwise known as "Cover-holders".

28.     In this case, there are many syndicates that have appointed and entrusted the US Cover holder "Peterson" to issue risks in which Peterson has underwritten.

29.     Peterson, being a US based Underwriter can license their insurance products, in this case Long Term Disability in certain States around the Country if the policy adheres and complies with the regulations established by each individual state Department of Financial Services.

30.          However, Peterson international is not a
licensed insurer in the State of New York for this Long-
Term Disability Policy, as they have presence within the
State of New York, and therefore cannot sell insurance
directly to consumers in this state.


31.          Peterson, as the Underwriter, must then
appoint an Agent within the State in which they wish to
market, sell and service. Basically, the Cover-holder,
"Peterson" in the NEXUS of the operation. The Lloyds
Syndicates have access to sell their product in the USA
through Peterson, and The State Agent that's appointed by
Peterson can get the Product sold in the state of New
York.


32.          In this case, it gets even more convoluted,
as Rampart Life or Branca-Rampart is a General Agent or
Broker appointed by Peterson, in which from information
and belief this company is in New Jersey or Possibly PA.


33.          In which a company Charter Trade Credit is
an appointed agent, yet also represents himself, and has

email and a business card stating he is a Vice President of Rampart Group, which is in New York.

34.         For all purposes of this action "Ilan D. Glenn" is the appointed agent in New York who owns a company called Charter Trade Credit which also is incorporated in the State of New York in which is a licensed NYS Insurance Agent(cy)in which sold this Long Term Disability Policy to the Plaintiff, in which such policy was issued in the State of New York. This policy of insurance and/or contract is thereby governed under the Laws of New York State.

35.         <u>The Insurance Contract</u>

36.         The Plaintiff and the Defendant(s)had negotiated a contract of insurance for disability income (the "Policy") effective Marco. 1st, 2012.

37.         The policy provided a monthly benefit amount of $10,800 monthly in replacement income for 60 months, and a %1,000,000 lump sum benefit had he become disabled after 63-months, or 5 years after benefits had been paid.

38.        The policy also contains a cost of living adjustment rider that provided additional benefits per the average C.P.I. up to an additional amount of 10% annually.

39.        The policy contains a 90-day (3-month) elimination period before any benefits would become payable under the policy.

40.        At such date and time of this submission to the court, the Policy benefits would have been exhausted. As of this date the claim paid would have been for $1,680,400 + Cost of Living Adjustments and other such benefits contained within the policy.

### i. The Underwriting / Application

41.        This insurance policy was issued based upon the representations during the application and underwriting that was conducted through the appointed and authorized agents of the defendant in which was conducted between September 2011 - February 2012.

42.        This policy for insurance was applied for and underwritten in conjunction with another Policy in

which was issued by "Principal Life Insurance Company"
"Principal".

43.          This underwriting process was not comprised
of a paper application, as the defendant has alleged in
his answer and counterclaim. (The Plaintiff will reference
such in his exhibits.)

44.          In fact, the exhibits will show that the
aforesaid application in which the defendant alleges was
the only operative application and underwriting document
was provided to the defendant after the policy was fully
underwritten and ready to be issued.

45.          At no point had the defendant relied upon
the questions or answers in this purposed application at
any time, other than for purposes solely to seek
rescission of this valid contract of insurance.

46.          The Court will also take note that the
"alleged application" in which the defendant states they
had relied upon to issue the policy, contains no reference
to any of the conditions of the riders that are attached

to the policy provided.

47.         The Court shall see that the underwriting
or the application was more of a "Back and Forth" email
chain between the underwriters, and when any questions
were directed to the Plaintiff, he responded truthfully.

48.         Exhibits E1-E15 will show this court a
clear timeframe and how this Lloyds policy was marketed,
applied for, and bound. The same exact applications were
used to underwrite this policy with Lloyds as the Policy
with Principal Life.

49.         The Contract / Insurance Policy that was
issued was not just based upon the representations made by
the Plaintiff, but also from many other sources: Such as
doctors records, Lab Work, an exam, Prescription Records,
Tax returns (personal & Business).  Representations were
all incorporated into the contract and its terms.

50.         The record will show that at no time did
the Plaintiff withhold any material fact and/or omit any
information in which was requested or required of him
during the application and underwriting of this policy. To

the contrary, if we simply refer to Just Exhibits E1 & E2, there were more disclosure of Brand's Medical & Social Life than that was required under the underwriting requirements established by the Defendant.

51.          In Exhibit E1, On September 9th, 2011 "Frank Johnston, Disability Consultant at Whitney Rampart Associates", is communicating back and forth with the Defendants Agent "David Glenn" after Mr. Glenn disclosed some preliminary underwriting information that was requested, such as his Date of Birth, His occupations which included being an Administrator at a Non-Profit, Owner of a Restoration Company, Part Owner of a Medical & Office Supply Company, an estimate of $450,000 of current annual salary.

52.          Mr. Glenn lists some of the Plaintiff's Health Issues, Slightly Elevated Cholesterol, (controlled with meds), Slight Anxiety using very low dose Abilify, Slightly elevated Blood Pressure, no longer an issue…

53.          On September 12th, 2011, Frank Johnston wrote an email to David Glenn and copied an employee named "Lee Ganz" "David, I need to know how long Jason has been

on Anxiety Meds and what caused his anxiety. What are his
duties for each company?

54.          The same day Mr. Glenn responds to Frank
Johnston "Only in the last 30-60 days, just work, family,
life in general. (he was going through a lawsuit as well)

55.          ON September 12, 2011 David Glenn tells
Frank Johnston, he is taking Cymbalta now for nerve pain,
he was taking Nortriptyline as well for nerve pain well
over a year ago and switched to Cymbalta.

56.          On September 12th, 2011 Frank Johnston asks
Mr. Glenn does he have any anxiety/depression issues? Do
you have any information on the nerve pain?

57.          If the court reviews the emails, and the
correspondence between the underwriters, we must wonder
where is all this information coming from?

58.          It's not coming from an application in
2012, we are still in 2011, which only can rationally mean
one thing! The application was not as the defendant has
alleged in their answer, or counterclaim.

59.          The alleged application in which the

defendant claims was the only operative application in this policy, or as shown in Exhibit E12, was only required after the policy was underwritten by the defendant. E12, in which Lori Alvarado, Disability Case Manager, Rampart America, "If your client would like to proceed, we just need the attached application completed and returned via fax or email. You will also need to be appointed in NY with Peterson International. (Please refer to the exhibits prior to this email, as the court will see exactly what this email has implied.

60.         Please refer to Exhibit E13, Peterson received the E-signed offer, a copy is attached for your file. They will now bind coverage and issue the policy. ***It usually takes a couple of weeks for us to receive the policy from Peterson, because it must be sent to the NY dept of Insurance Stamping office for filing and tax payment. We will forward the policy when we receive it. ***

61.         Which as of note, if we refer to the defendants answer and counteraction, it starts that the Plaintiff has a 10-day review period, yet the policy takes a couple of weeks to arrive from Peterson to Rampart.

62.         Therefore, if the court refers to Exhibit
E13, the court will see a copy of the E-signed offer. This
offer is NOT the policy, yet, the defendant accepted the
premium on this day, and placed the policy into effect on
this day.

63.         There is no policy attached, nor is there a
signed acceptance from "Peterson" no certificate number,
and no assigned syndicates.

64.         This is the operative "warranty" or
"Promise". Its effective as the defendant honored the
Premium payment and acknowledged the fact it was accepted.

65.         Which is contrary to the fact that in which
the defendant has determined 3 ½ years later that this
same policy after receiving premium payments and
constantly reaffirmed that this policy was in effect. Yet,
only in effect if the defendant collected the premium and
did not have to honor a claim.

66.         The Plaintiff did not break any promise,
the plaintiff provided all the information that was

requested during the underwriting (application) cooperated with the defendant in obtaining any needed medical documents, exam, or financial states they needed, took the representation (warranty) that the policy was in effect and made payments promptly as agreed to.

67.          It's perfectly clear, the defendant never intended to honor their promise or this contract. The defendant took advantage of an unsophisticated consumer, and by asking the Plaintiff to complete these few pages (in which the Defendant refers to as "The Application") after the defendant agreed and accepted the risk, was their "own secret" insurance policy in which they could use such to evade a valid claim by misrepresenting what actually constituted the application.

68.          **Causes of Action –**

69.          **Breach of Contract** – as explained above the Plaintiff and defendant entered this contract freely, all facts were disclosed, there was no sinister or deceit in any matter. The Plaintiff made full disclosure of all material facts in which were asked upon him or required and honored his commitment by submitting premium payments as defined under the policy/contract.

70.            **Fraudulent Inducement &**- The defendant made

representations that were materially false in order for

the Plaintiff is enter into the contract. When and after

the Plaintiff had made full disclosure of the stated risk

and provide all required documentation and representations

as per the underwriting requirements.

71.            **The Tort of Bad Faith & Fair Dealing** The

defendant upon accepting the risk, only with intent to

receive the benefit of the bargain by attempting to

eliminate the true and complete application in which what

was relied upon in order to Avoid their promise and/or

warranty in which was made. The tort is geared at the

public not just at the Plaintiff, as the court could

imagine, most insureds are not "lucky enough" to have

saved all the relevant emails as to how this policy was

bound and what has taken place.


a. The defendant accepted the risk yet placed a back

   door so that had the risk triggered the defendant

   could avoid the contract by making these

   misrepresentations in this court.

b. Keeping in mind, we have been litigating this action

   for 5 years, this is a Disability Income Policy that

   is marketed to the Public to preserve their assets

and to care for their families. People who are
unfortunately injured or sick and without resources
should not be litigating a right or promise in which
they had relied upon.

c. This is a very sick and twisted situation is which
essentially removes all faith in the insurance
industry. Think about this for a moment, suppose I
died, or I was Brain Damaged and could not fight this
injustice and the fact of the matter is, regardless
of what is alleged in the defendants answer and
counterclaim, the evidence speaks for itself. I have
two children that were 6 years old when this claim
was denied. Half of their lives have been traumatic
because of the cats of this defendant, simply
allowing a breach of contract claim to be pursued
after all the consequential damages done to so many
first and third parties is not justice, and it will
serve nothing more than a slap on the wrist.

d. This will continue and our country will look at cases
like this and the actions of the defendant and the
foundation of the intent of the insurance industry
will crumble, there will be no faith in the system.

e. *See: New York Univ., 87 N.Y.2d at 316.   With regard to the insurer's conduct being actionable as an independent tort, the Court explained that "the very nature of the contractual obligation, and the public interest in seeing it performed with reasonable care, may give rise to a duty of reasonable care in performance of the contract obligations, and the breach of that independent duty will give rise to a tort claim.*

72.    **Unjust Enrichment** – Not only did the defendant continue to accept premium up until the date in which the claim was made, The policy contained a 90-day waiting period in which after such waiting period, premium payments were contracted to be waived during a time of disability.

73.    The defendant, continued to demand that payment be made under the policy even after the 90-day waiting period has elapsed, all while making the representation that had the Plaintiff stop making premium payments, they would effectively stop adjusting the claim.

74.    <u>The defendant in effect ramified</u> that the contract of insurance was indeed still in effect after the 90-day

waiting period by accepting and honoring premium payments and therefore not-cancelling the policy.

75.    New York Insurance Law §2601:

76.    Unfair Claims Settlement Practices.

77.    Declaratory Judgement that the Policy is valid and may not be rescinded

78.    Obtaining Premium after claim submittal, threats of cancellation and claim abandonment if premium not paid. - Undue delay, Defendant failed to seek court intervention.

79.    Violation of NYS Insurance Law

80.    Bad Faith Litigation Practices

81.    Abuse of Process / Discovery Abuse

82.    Spoliation of Evidence in Anticipation of Litigation

83.    Common Law Fraud

84.    Violation of HIPAA

85.    Punitive Damages / Treble Damages

86.    Costs, Frees Interest



87.    **RESPONSES TO DEFENDANTS COUNTERCLAIM -**

88.    The defendant alleges that the Plaintiff withheld information related to legal issues he was enduring around the time this claim was submitted is simply false.

89.         This representation was made to the
defendant in the beginning, how can someone hide something
that was of public record and of public knowledge?

90.         Not only did the Plaintiff make such a
representation

91.         to the claims agent in which the defendant
had appointed "DMS". Disability Management Services "DMS"
was also the same claim adjusting company that the
Plaintiff's ERISA governed Long Term Disability Policy
"CIGNA" was using to address that claim. The plaintiff's
legal issues at such time was partially related to his
alleged capacity with that employer, Narco Freedom Inc.

92.         This allegation that the defendant makes in
which alleges the Plaintiff withheld UNRELATED information
as to his legal troubles at the time "bogles my mind" and
in all fairness should make the court wonder how far is
the defendant is willing to go here? THE PLAINTIFF DENIES
THIS ALLEGATION

93.         Which brings the Plaintiff to the next
allegation made by the Defendant. My claim for benefits
was not primarily for Mental Health issues.

94.          The Plaintiff was honest and obviously made

the mistake somewhat confiding in his insurer by

expressing the emotional toll that he was exhibiting for

various reasons. The Plaintiff has undergone 5+ surgeries

since becoming disabled?

95.          The issues the Plaintiff is experiencing

physically CONTINUES to NOT improve in many respects.

96.          The emotional toll of these litigations for

the last 5+ years, a pending custody and divorce matter

which also has been ongoing for years, Bankruptcy 3 Times,

my home that I had built with my bare hands (obviously

with many more experienced staff) is being sold at Public

Auction next month.

97.          The defendant's allegations IS FALSE that a

Legal Action in which was referred to as "The Civil

Forfeiture Action" had any relevance in any which matter

to the Plaintiff's claim of Disability. – DENIAL –

98.          Although we call it the "civil forfeiture"

action, it never actually forfeited anything. This action

consisted of a TRO and a "Pre-Judgement" Attachment Order. There was never any forfeiture by the claiming agent in that unrelated civil action, that action has since been discontinued.

99.         If nothing was subject to forfeiture and there was no restitution. Where is the public policy concern the defendant alleges? I brought this action to enforce a contract, in which the defendant breached among other causes of action set forth above.

100.         Although it may be convenient for the defendant to look for excuses to evade their contractual obligations and to excuse their wrongful and deceitful actions, one case has nothing to do with the next. If the defendant wishes to assert a Public policy concern, it must be applied to this cause of action.

101.         not a closed state action.

102.         Especially when Public Policy would actually frowned upon the defendants Public Policy argument given the State Court had issued a certificate of relief from disabilities, in which would have removed any collateral Consequences, had such  applied to me, in which

they do not.

103.        The marketing methods of insurance companies in which provide protection to those in need are false and deceitful, Public Policy does t want insurance companies deceiving people who are sick or injured. Its against both state and Federal Consumer Protection Statues.

104.        The defendant is based in another country, this can be perceived as money laundering, it affects interstate commerce and Trade, the Syndicates are in London, there are at 2 or acts of Racketeering, in which a Criminal Enterprise exists. This contract, as many contracts and individuals are most likely being deceived through this scheme.

105.        The defendant who is alleging Public Policy concerns really needs to take a step back and focus on their own business practices and think about how many of their customers are being exploited every day by their own acts that are highlighted in this current litigation.

i. **FINANCIAL DISCLOSURE**

106.         The defendant took 2 or 3 years of all my business and personal tax returns at the time of underwriting. Any allegation, as to what my income was comprised of is again not supported by the record. See Exhibit E1 - September 9th, 2011, all my occupations are listed with an estimated gross income. Exhibit E5, in which Business and Personal Tax Returns were supplied to the defendant. What company(s) I was employed by and what company(s) I owned and my what occupation/job was for each company was in these records.

107.         Again, Contrary to the defendant's allegations again none of my Personal or Business Tax returns were ever deemed to be false.

108.         I utilized the same accounting firm for all my businesses, and the firm happened to also do the taxes and financial statements for all the businesses in which I have worked for.

109.         The defendants have obtained all my financial records directly from the accountants, during the underwriting, the claims process, and yet again a few

more times during the past 5 years of discovery in this
action.

110.        Not only that, the Agent that was appointed
by the defendant "Rampart" must have written hundreds of
thousands if not millions of dollars in premium for
company(s) in which I either worked for or owned, to
include many personal policies such as homeowners, Auto,
and Life Insurance.

111.        The intention of always using the same
insurance broker(s) and the same accountants, likewise,
was due of the knowledge, duty and care as well as the
expertise in my business and personal needs.

112.        **Declaratory Relief:**

113.        The Plaintiff has asked this court to issue
a declaration that this policy is Valid and could not be
rescinded as the defendant has stated that they have done
unilaterally without seeking judicial determination until
the Plaintiff brought this action to enforce the contract.

114.        If the court shall find that the Contract

is valid, and could not be rescinded, rendering the
defendant in default.

115.        The Plaintiff seeking damages and interest
in excess of the policy value.

116.        In Conclusion

117.        "[T]he equitable remedy [of rescission] is
to be invoked only when there is lacking complete and
adequate remedy at law and where the status quo may be
substantially restored" (Rudman v Cowles Communications,
30 NY2d 1, 13 [1972]).

118.        "[A] party waive[s] its right to seek
rescission of the ... agreement by failing to promptly
seek rescission after accepting the benefits of that
agreement (see New York Tel. Co. v Jamestown Tel. Corp.,
282 NY 365, 372-373 [1940]; R & A Food Servs. v Halmar
Equities, 278 AD2d 398 [2000]; Capstone Enters. of Port
Chester v County of Westchester, 262 AD2d 343 [1999])."

119.        This is precisely why New York State

enacted a 2-year contestability period.

120.          At least, in 2 years we hope people have better recollection of the terms of the contract. It's completely inequitable and unfair to allow any party to unilaterally avoid a contract, let alone one such as this.

121.          The purpose of a consumer entering this agreement/contract is to prevent exactly what has happened in this case!

122.          Insurance is an Aleatory contract; consumers can pay premiums for a lifetime and never get the benefit of the contract or a consumer could pay a given premium and be eligible for a benefit. The contract is risk based, and both parties depend upon each other throughout the term of the contract.

123.          **<u>DAMAGES & RELIEF REQUESTED</u>**

124.          The Plaintiff therefore prays for the relief stated herein:

125.          Relief should be as follows: $10,800 x 60

   months = $648,000

126.          Plus $1,000,000 policy pay out after 63

   months = $1,648,000 plus NYS Prevailing Pre-Judgement

   Interest Rate (9%) beginning Jan 2015.


127.          $129,600 x 9% = $11,664 (2015)

128.          $141,264 x 9% = $12,713 (2016)

129.          $153,978 x 9% = $13,858 (2017)

130.          $167,836 x 9% = $15,105 (2018)

131.          $182,941 x 9% = $16,465 (2019)

132.          _____          _____

133.          $775,619   +      $69,805 = $845,424

134.          + $1,000,000

135.          $1,845,424 X 0.75% per month, (as of March

   2020) (3 Months) interest to date" $41,522.04


136.          ATTORNEY FEES (WHILE IT LASTED) $40,000


137.          **Consequential Damages –** Given the type of

policy in which was issued, and the purpose of such policy. The defendant is marketing the policy so that the Plaintiff would not have foreseeable consequential damages as a result of being disabled. The very crux of this policy as its marketed to its potential policyholders is by showing the consumer what will happen to them if they do purchase this policy. Therefore, rule 9, or the special pleading requirements are thereby easily met. As there is no question that the defendant knew the direct consequence of their actions in denying the claim, and as a result of the continued delays throughout litigation.

138.       The defendant, when it became clear to them upon the discovery of the emails presented in this action making a clear showing of the genuine good intent the parties exhibited when this contract was created.

139.       The defendant had an ongoing duty to it insured to promptly remedy their breach, and they could have at any time to lessen the possible consequential damages unduly imposed upon the Plaintiff.

140.       However, its apparent that the Defendant simply never intended to honor their contract, and thus

continued to engage in the same tortious conduct, knowing

that such consequential damages would occur  into this

what would happen had they engaged in the conduct, without

regard.

141.        The Following are just some of the

consequential damages in which the Plaintiff have endured

as a direct result of the defendant's actions to date and

ongoing.


142.        LOST - LONG-TERM CARE INSURANCE / LIFE

POLICY, (UNABLE TO PAY PREMIUM) - 2 MILLION DOLLAR VALUE

(GIVEN THE FACT IM DISABLED, OLDER, A REPLEACEMENT POLICY

IS NOT FEASABLE) $2,000,000


143.        LOST - WHOLE LIFE POLICY, $2,500,000

BENEFIT (UNABLE TO REPLACE DUE TO HEALTH / AGE) $2,500,000



144.        LOST - BOCA RATON PROPERTY DUE TO

FORCLOSURE - $100,000 LOST IN VALUE, AS RESULT OF BANK

SALE


145.        LOST - BOYNTON BEACH PROPERTY - $135,000 IN

VALUE LOST DIE TO BANK SALE

146.          CHILDREN'S 529 FUNDS LIQUIDATED TO PAY

EXPENSES (DUE TO BREACH OF CONTRACT) $87,000 ACCOUNT VALUE

X 2 (AMERICAN FUNDS) + INTEREST = $180,000+


147.          CREDIT CARD DEFAULTS / CREDIT DESTROYED –

CREDIT SCORE DECREASED FROM 790-436,

148.          CHAPTER 7 LIQUIDATION,


149.          LOST 800K + IN PRIMARY HOME EQUIITY DUE TO

DEFAULT


150.          The Plaintiff seeks punitive damages as

plead and allowed in this action as the acts of the

defendant has not only committed acts against himself. The

defendant has committed tortious actions geared towards

the general public. Such actions should not be tolerated

and without a harsh punishment, the defendant will

continue their acts harming many more citizens of this
country. There must be a harsh penalty for the conduct
exhibited.

Dated: March 9, 2020

Melville, NY 11747                                    Jason Brand

cc. Counsel for Certain Underwriters at Lloyds of London