UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X
JASON P. BRAND,

                    Plaintiff,

                          -against-

PETERSON INTERNATIONAL UNDERWRITERS
INC. ("PIU"), DISABILITY MANAGMEENT
SERVICES ("DMS"), CERTAIN UNDERWRITERS
AT LLOYDS OF LONDON THAT HAVE
SUBSCRUBED TO CERTIFICATE NUMBER
1254480,

                    Defendants.
------------------------------------------------------------X
THOSE CERTAIN UNDERWRITERS
AT LLOYD'S, LONDON SUBSCRIBING TO
POLICY NO. 1254480,

                    Counterclaimants,

                          -against-

JASON P. BRAND,

                    Counterclaim-defendant.
------------------------------------------------------------X

**REPORT AND
RECOMMENDATION**

15-CV-6371 (GRB) (JMW)

**A P P E A R A N C E S :**

**Scott Evan Agulnick**
**Todd D. Kremin**
Greenblatt & Agulnick P.C.
55 Northern Boulevard
Suite 302
Great Neck, NY 11021

1

**Nolan C Burkhouse**
**Andrew A Beerworth**
Paul Frank & Collins P.C.
One Church Street
Po Box 1307
Burlington, VT 05402

**WICKS,** Magistrate Judge:

## I.    PRELIMINARY STATEMENT

Plaintiff/Counterclaimant Defendant Jason Brand commenced this action against

Defendant/Counterclaimant Certain Underwriters at Lloyds of London That Have Subscribed to

Certificate Number 1254480 ("Underwriters" or "Defendant"), seeking payment of monthly

Total Disability benefits totaling $648,000 and the Policy's $1 million lump sum benefit for

Permanent Total Disability.[1]  (DE 31 at ¶¶13-16.)  Plaintiff claims that Defendant wrongfully

rescinded the Policy, a disability insurance policy, due to material misrepresentations in the

application and otherwise wrongly denied his claim for benefits submitted under the Policy

related to neck and right shoulder conditions.  (DE 194-29 at ¶1.)  Additionally, Plaintiff seeks

an award of punitive damages and unspecified consequential damages based on alleged bad faith

by Defendant.  (DE 31 at ¶¶13-16.)  Defendant denied the existence of payable benefits and filed

counterclaims against Plaintiff seeking recission of the Policy based on fraudulent and material

misrepresentations in the application and endorsements.  In turn, Defendant requests declaratory

relief that the Policy never became effective due to Plaintiff's failure to disclose relevant changes

in health and prior neck conditions.  (DE 134.)  Before the Court on referral from the Honorable

---

[1] Named Defendants Petersen International Underwriters Inc. and Disability Management Services, Inc.,
were voluntarily dismissed on February 8, 2016 (Electronic Order dated Feb. 8, 2016.)  Plaintiff's
subsequent attempt to withdraw the stipulation of voluntary dismissal was denied on July 20, 2016 (DE
34) and although Plaintiff filed an amended complaint on June 16, 2016, renaming Petersen International
Underwriters Inc. and Disability Management Services Inc. (DE 31), the parties were never served.  The
parties then executed a stipulation, dismissing these two entities without prejudice, which the Honorable
Gary R. Brown So-Ordered on February 28, 2022.  (DE 199; Electronic Order dated Feb. 28, 2022.)

Gary R. Brown are the parties' motions for summary judgment, DE 193; DE 194; DE 195

(Defendant's) and DE 196; DE 197; DE 198 (Plaintiff's).  The parties appeared for oral

argument before the undersigned on May 10, 2022.  (DE 201.)  For the reasons that follow, the

undersigned respectfully recommends that Defendant's motion be GRANTED in part and

DENIED in part, and that Plaintiff's motion be DENIED.

## II.   FACTUAL BACKGROUND[2]

### A.  Plaintiff's Relevant Medical History

Plaintiff began seeking medical treatment for cervical spine pain in 2009.  (DE 194-29 at

¶12.)  Between 2009 and 2011, Plaintiff treated with neurologists – Dr. Dexter Sun and Dr. Rose

Marie Mathew – and pain management physicians – Dr. Alan Millman, Dr. Semih Gungor, and

Dr. Suzanne Yu – for his neck pain and headaches caused by a cervical disc herniation.  He was

also treated for a disc protrusion, cervicalgia, and cervical radiculopathy which interfered with

his daily activities and for which he underwent physical therapy and cervical epidural steroid

injections.  (*Id.*)

On February 1, 2012, Plaintiff underwent a thoracic spine MRI due to pain in his mid-

back, although he claims that the MRI was also done for underwriting purposes.  (*Id.* at ¶¶31-

32.)  The thoracic spine MRI revealed disc herniations causing right lateral recess stenosis at T6-

7 and T7-8.  (*Id.* at ¶33.)  Dr Yu. faxed the MRI report to Plaintiff at his request on February 3,

2012 and Dr. Yu personally spoke to Plaintiff regarding the results within the week after the test

was completed.  (*Id.* at ¶¶34-35.)

---

[2] The following facts are drawn from Plaintiff's Statements (DE 194-29; 196-2; 198-1) and Defendant's
Statements (DE 193-2; 197-1) pursuant to Local Rule 56.1, as well as other evidence found in the record
of this action. *Ayazi v. United Fed'n of Teachers Loc. 2*, 487 F. App'x 680, 681 (2d Cir. 2012) ("when
assessing a summary judgment motion, a District Court may consider other materials in the record").

On March 1, 2012, Plaintiff treated with Dr. Sun complaining of severe and acute pain and numbness in his right upper and lower extremities, that had lasted for four weeks. (*Id.* at ¶72.) Although Plaintiff claims that the pain was due to an errant self-administered injection meant to treat Klinefelter Syndrome, Dr. Sun's reviewed Plaintiff 's December 20, 2011 cervical spine MRI and February 1, 2012 thoracic spine MRI, and ordered Plaintiff to undergo an electromyography and nerve condition test. (*Id.* at ¶¶72-73; 76.) Dr. Sun also sent Plaintiff for testing to rule out a stroke. (*Id.* at ¶74.) Dr. Sun then diagnosed Plaintiff with cervical radiculopathy. (*Id.* at ¶76; DE 193-6 at 44.) Plaintiff received thoracic spine injections in 2012 and, on August 2012, underwent a fusion surgery after he was involved in a car accident on June 19, 2012. (DE 194-29 at ¶37.)

Plaintiff presented to Dr. Artem Vaynman on November 6, 2014, complaining of neck pain, headaches, and upper extremity weakness. (*Id.* at ¶114.) On January 14, 2015, Plaintiff elected to undergo neck surgy with Dr. Vaynman for his chronic neck condition and disc pathology (C3-4 cervical disc herniation and radicular symptoms), the same chronic neck condition and disc pathology noted on the December 20, 2011 MRI and for which he had received extensive treatment prior to applying for the Policy. (*Id.* at ¶122.)

**B.  Plaintiff's Application for Disability Insurance**

On September 18, 2011, while Plaintiff was experiencing pain symptoms and actively treating for cervical and thoracic conditions, he began an application process with his insurance broker, David Glenn, to secure coverage for these specific areas of his spine. (*Id.* at ¶¶4-5, 11.) Glenn advised Plaintiff to give truthful and complete information in response to questions in insurance applications. (*Id.* at ¶14.) The first application process was for a policy from Exceptional Risk Advisors ("Exceptional"), who offered Plaintiff disability insurance coverage

4

subject to a "full spine exclusion" because of a prior lumbar spine history that Plaintiff disclosed. (*Id.* at ¶19.)  This meant that the policy would not cover any loss resulting from disease or disorder involving any level of his spine.  (*Id.*)

On January 9, 2012, without accepting or rejecting Exceptional's coverage offer, Plaintiff submitted another application for disability insurance, this time with Principal Life Insurance Company ("Principal").  (*Id.* at ¶25.)  On February 7, 2012, Principal delivered a policy to Plaintiff that provided a maximum monthly disability benefit of $18,250 with coverage effective as of January 15, 2012.  (*Id.* at ¶38.)  The Principal policy contained a rider that excluded coverage for injury or disease to the lumbar spine specifically.  (*Id.* at ¶39.)  On February 8, 2012, Glenn requested that Exceptional revise its offer to include a spine exclusion limited to the lumbar region, similar to the Principal coverage, but Exceptional refused unless Plaintiff would submit a current CT scan or MRI of his spine.  (*Id.* at ¶¶42-43.)  Plaintiff nor Glenn on Plaintiff's behalf subsequently submitted a CT scan or MRI to Exceptional.  (*Id.* at ¶44.)

On February 14, 2012, Glenn solicited a policy proposal from Underwriters via their designated "coverholder," Petersen International Underwriters Inc. ("Petersen").  (*Id.* at ¶45.) Plaintiff received Petersen's proposal that day, and subject to all underwriting requirements, the proposal included maximum monthly benefit coverage of $10,800 in excess of the $18,250 monthly benefit coverage with Principal, and a $1 million lump sum benefit for permanent total disability.  (*Id.* at ¶47.)  The proposal included an exclusion for the lumbar spine based on Plaintiff disclosing that he had lumbar spine surgery.  (*Id.* at ¶48.)  With Glenn's assistance, Plaintiff completed and signed the application on February 14, 2012.  (*Id.* at ¶49.)  On February

16, 2012, Petersen received a partially completed and signed application from Plaintiff. (*Id.* at ¶51.)

  As part of the underwriting process, Petersen required a paramedical exam of Plaintiff, and accepted the paramedical exam from Plaintiff's broker for the exam that Plaintiff underwent several months earlier for the Exceptional policy application. (DE 197-1 at ¶17.) Petersen further required an attending physician statement ("APS") from Plaintiff, which was provided by Dr. Steven Goldberg. (*Id.* at ¶18.) Petersen also obtained HIPAA authorizations from Plaintiff and independently obtained records from Dr. Goldberg. (*Id.* at ¶19.) Petersen retained Dr. Al Melarangno to review Dr. Goldberg's records and the APS. (*Id.* at ¶22.) One of Dr. Goldberg's records from an April 1, 2010 office visit referenced epidurals and cervical radiculopathy. (*Id.* at ¶20.) On February 29, 2012, after conducting the medical underwriting, Petersen provided a Personal Disability Insurance Offer including several endorsements which Plaintiff could electronically review, sign, date, and submit. (DE 194-29 at ¶62.) Specifically, the limited low back exclusion was expressly conditioned on Plaintiff signing several application amendments and warranty endorsements regarding his medical history. (*Id.* at ¶63.) Plaintiff signed, dated, and submitted the offer documents, including the endorsements on March 1, 2012 and the initial premium was processed that same day. (*Id.* at ¶¶65-66.) Plaintiff did not expressly disclose any cervical or thoracic medical history in the February 14, 2012 application, and did not expressly admit to any medical visits for his cervical or thoracic spine during the past ten years in the Back Warranty Endorsement dated March 1, 2012. (*Id.* at ¶78.)

  Defendant issued the Policy to Plaintiff on March 2, 2012, effective March 1, 2012 to February 28, 2017. (*Id.* at ¶77.) Defendant relied on the representations and warranties Plaintiff made in the application that he signed on February 14, 2012, the Application Amendment

6

Endorsement that he signed on March 1, 2012, the Back Warranty Endorsement that he signed on March 1, 2012, and the Personal Disability Insurance Offer that he signed on March 1, 2012, (*Id.*), in addition to the paramedical exam, full blood profile, urinalysis, treatment records from Dr. Goldberg. (DE 197-1 at ¶19.) Plaintiff accepted Defendant's Policy and never notified Defendant of his neck-related medical visits or pain symptoms that occurred from the time of his application (February 14, 2022) to the issuance of the Policy (March 2, 2012). (DE 194-29 at ¶79.) Plaintiff continued treatment for his cervical and thoracic spine pain until his disability claim with Defendant in November 2014. (*Id.* at ¶80.)

### C. The Pertinent Application Questions/Endorsements

Question 22 of the Petersen application states: *"Have you ever been evaluated or treated for any injury, condition or disorder involving the following?" – "If 'Yes' is answered for any of the following questions please provide full details in the space below. If there is insufficient space, please attach your answers on a separate sheet."* (DE 194-29 at ¶53; DE 193-10.) Plaintiff did not disclose evaluations or treatment for any injury, condition or disorder related to his cervical or thoracic spine. (DE 194-29 at ¶54; DE 193-10.)

Question 29 of the Petersen application read: *"Within the last 5 years have you had x-rays, electrocardiograms, blood studies or other diagnostic tests?"* (DE 194-29 at ¶55; DE 193-10.) Plaintiff disclosed the lumbar disc surgery, but did not disclose any imaging or diagnostic tests for any injury, condition or disorder relating to his cervical or thoracic spine. (DE 194-29 at ¶56; DE 193-10.)

Question 21a.-c. of the Petersen application read: *"Last healthcare provider seen: a. Name & address; b. Date and reason last seen; c. Results of last visit."* (DE 194-29 at ¶57; DE 193-10.) Plaintiff did not respond and, when Petersen followed up, Plaintiff's brokerage agency

advised that the last healthcare provider Plaintiff saw was his primary care physician, Dr. Goldberg, in June 2011 for a routine physical, the results of which were normal. (DE 194-29 at ¶¶57-59.) Plaintiff signed the Amendment Endorsement on March 1, 2012, which included this same information. (*Id.* at ¶67.) Plaintiff did not disclose his more recent treatment with Dr. Yu, including epidural steroid injections for pain and disc herniations in his cervical and thoracic spine. (*Id.* at ¶68.) Plaintiff did not consider his visits with Dr. Yu as "treatment" because he saw Dr. Yu all the time and sometimes instead of injections, she would "just knock[] him out with propofol, tell him that she was going to make him feel better, and then they would go to dinner." (*Id.*)

Question 35 of the Petersen application read: *"To the best of your knowledge and belief, are you in good health and free from any mental or physical impairment, except as described in this application?"* (*Id.* at ¶60; DE 193-10.) Plaintiff responded, "Yes." (DE 194-29 at ¶60; DE 193-10.) The "Back Warranty Endorsement" that Brand signed on March 1, 2012 read:

> I hereby confirm that in the last ten (10) years, other than issues related to my low back, I have had no back and/or neck pain or discomfort which required medication (including non-prescription medicine) for more than five (5) consecutive days or visits to any health professional(s).

> I further confirm that in the last ten (10) years, other than issues related to my low back, I have had no back and/or neck pain or discomfort which limited my daily activities or work performance more than five (5) consecutive days.

(DE 194-29 at ¶ 69; DE 193-11.)

**D. The Offer and Policy**

Petersen's offer contained the following terms and conditions.

> PLEASE NOTE THAT IF THERE HAVE BEEN ANY MATERIAL CHANGES IN YOUR HEALTH, OCCUPATION OR INCOME SINCE THE DATE OF SIGNING THE APPLICATION FOR THIS INSURANCE, THIS OFFER MUST BE IMMEDIATELY

> RETURNED TO US WITH A WRITTEN DESCRIPTION OF SUCH CHANGES FOR UNDERWRITERS' REVIEW AND CONSIDERATION.
> ******
> PLEASE NOTE THIS OFFER IS BASED ON INFORMATION PROVIDED TO PETERSEN INTERNATIONAL UNDERWRITERS. IN THE EVENT ADDITIONAL INFORMATION IS DISCOVERED WHICH INDICATES MISSTATEMENT, CONCEALMENT OR FAILURE TO DISCLOSE, WHETHER INTENTIONAL OR INADVERTENT, ANY COVERAGE ISSUED OR OFFER MADE MAY BE MODIFIED OR VOIDED.

(DE 194-29 at ¶71; DE 193-56, Ex. O).  Plaintiff signed the application for the Policy, attesting to the following:

IT IS UNDERSTOOD AND AGREED:

> 1. that all answers to the questions on this application, to the best of my knowledge and belief, are complete and true,

> 2. that all answers on this application shall form the basis of the issuance of any coverage hereunder,

> 3. that in the event of any fraud, misstatement, concealment, or failure to disclose information in response to any question on this application,

> whether intentional or inadvertent, any insurance coverage issued based upon this application may become void, and no benefits shall be payable, and

> 4. the insurance hereunder applied for shall take effect on the date set forth on the certificate, if issued, provided the first premium and all requirements are received within 31 days of the effective date and there have been no changes to any questions on this application between the date of application and the effective date of the certificate.

> 5. I have read or had read to me and understand each of the questions and statements on this entire application.

> 6. No one has prevented me from spending as much time as I felt was necessary to understand this application.

(DE 194-29 at ¶61; DE 193-56, Ex. O.)

The policy states in part:

We, Certain Underwriters at Lloyd's, in consideration of the statements made in Your application for this insurance and the timely payment of premiums, agree to insure You against the perils shown in the Schedule of Benefits, subject to the terms and provisions of this certificate, from the effective date to the expiry date. We will, subject to the terms of this certificate, pay the benefits shown in the Schedule of Benefits. This certificate is a legal contract between You and us.

To become effective, this certificate must have been issued, the initial premium must have been paid and there must not have been any material changes in Your health, occupation or income as described in the application for this certificate. If there have been any material changes in Your health, occupation or income since the date of signing the application for this insurance, this certificate must be returned to us with a written description of such changes for our review and consideration.

(DE 194-29 at ¶84; DE 193-56, Ex. O.)  The Policy also sets forth the following exclusions:

## **EXCLUSIONS**

No benefits will be paid due to Sickness or Injury caused by, contributed to by or related to the following and/or their treatments and/or complications thereof (unless deleted by endorsement):

7. Mental or Nervous Disorders;
8. Pre-Existing Conditions;
9. any symptoms of Subjective pain unless supported by objective medical findings[.]

(DE 194-29 at ¶86; DE 193-56, Ex. O.)  "Pre-Existing Conditions" and "Sickness, Illness" are

defined in the Policy as follows:

**Pre-Existing Conditions** are physical, mental or chemical conditions which arise from any Accident or Sickness which was: 1) not disclosed on the application, and 2) for which You sought any medical advice or treatment prior to the effective date of this insurance or which caused symptoms for which an ordinarily prudent person would have sought medical advice.

**Sickness, Illness** means a Sickness or disease which causes a disability while this certificate is in force and is not a Pre-Existing Condition.

(DE 194-29 at ¶86; DE 193-56, Ex. O.)  Additionally, the Policy contains an Elimination period of 90 days for all temporary disability benefit claims and an elimination period of 63 months for permanent total disability claims.  (DE 194-29 at ¶¶88-89; DE 193-56, Ex. O.)  The policy further states:

> FRAUD, MISSTATEMENT OR CONCEALMENT: If You or any person for You commits fraud, a misstatement or concealment either in the application or by any other statement this certificate may become void and no benefits will be payable.

(DE 194-29 at ¶85; DE 193-56, Ex. O.)

**E.  Criminal Proceedings Against Plaintiff**

In June 2014, the New York State Attorney General's office executed search warrants against Plaintiff and his businesses and confiscated his computers and physical files.  (DE 194-29 at ¶102.)  On October 16, 2014, Plaintiff and his father, and two of their companies – DASO and Narco – were indicted by a Grand Jury on charges of insurance fraud and grand larceny.  (*Id.* at ¶107.)  On October 20, 2014, an Order of Attachment was entered, freezing Plaintiff's assets including all bank accounts, automobiles and real estate. (*Id.* at ¶108.)  On October 22, 2014, Plaintiff was arrested and arraigned on the insurance fraud and grand larceny charges listed in the indictment.  (*Id.* at ¶110.)  On October 31, 2014, Plaintiff submitted a false affidavit to the Court in the asset forfeiture proceeding, attesting that he had never utilized a home equity line of credit, when in fact, he had drawn $20,000 from the home equity account 7 days earlier.  (*Id.* at ¶112.)  On November 4, 2014, Plaintiff told Dr. Catherine Zillmann, a mental health provider that all of his businesses had been affected by the criminal case against him.  (*Id.* at ¶113.)

11

In March 2015, the New York Attorney General issued a superseding indictment that added a charge of perjury in connection with the false affidavit filed with the Court during the asset forfeiture proceeding. (*Id.* at ¶135.) On February 8, 2016, Plaintiff signed a Plea and Cooperation Agreement, agreeing to plead guilty to perjury in the second degree, and guilty to the crimes of enterprise corruption with criminal acts including insurance fraud in the first degree and grand larceny in the second degree. (*Id.* at ¶152.)

### F. Plaintiff's Disability Claim

On November 6, 2014, Defendant was notified that Plaintiff intended to pursue a claim under the policy. (*Id.* at ¶115.) On that same day, Plaintiff presented to Dr. Vaynman complaining of neck pain, headaches, and upper extremity weakness. (*Id.* at ¶114.) On November 18, 2014, Plaintiff signed and submitted a Claimant's Statement form to Defendant claiming a neck-related disability, and claiming "finger/hand numbness, headaches." (*Id.* at ¶118.) Plaintiff described the alleged disabling condition as neck pain, headaches and upper extremity numbness, and stated that the symptoms first appeared "around a month ago." (*Id.* at ¶120.) Plaintiff also responded on the form that he "[n]ever [had] any issues to this area of spine + these symptoms." (*Id.* at ¶121.) Around this time in November of 2014, Plaintiff also submitted a claim to Principal, alleging anxiety and depression due to the criminal and civil forfeiture proceedings against him, and for which Dr. Zillman submitted a Psychiatric Questionnaire. (*Id.* at ¶¶116-117.)

On November 10, 2014, Defendant's claim administrator, DMS, sent an acknowledgement letter to Plaintiff advising that they would review Plaintiff's claim and directed Plaintiff to continue making premium payments. (DE 196-2 at ¶41; DE 196-27.) Defendant conducted an independent investigation into the criminal proceedings against Plaintiff

12

and also investigated "other matters." (DE 197-1 at ¶4.) On June 10, 2015, DMS recommended to Defendant that they rescind the Policy based on concerns related to a "suspicion of fraud." (*Id.* at ¶46.) On June 11, 2015, Petersen requested that Plaintiff pay his premium. (*Id.* at ¶47.) However, on June 25, 2015, Defendant completed the claim review, instructed DMS to rescind the Policy, and Petersen complied with Defendant's directive (via DMS) to process a rescission endorsement with check payable to Plaintiff for all premiums paid. (*Id.* at ¶¶ 66-68.) On June 29, 2015, Defendant sent Plaintiff a letter rescinding the Policy based on the neck-related misrepresentations, issued a Rescission Endorsement and check to Plaintiff for $11,265.69 for all premiums paid, and subsequently issued a Revised Rescission Endorsement and check for $12,351.75. (DE 194-29 at ¶¶149-150.) The last date that Plaintiff actually paid a premium was March 1, 2015, more than 2 months before DMS received an underwriting opinion from Petersen regarding the materiality of Plaintiff's misrepresentations, and over 3 months before Defendant had the information on which they based their decision to rescind the Policy. (DE 202 at 47-48; DE 197-1 at ¶¶59-66, 69.)

The June 29, 2015 letter advised Plaintiff that even without rescinding the Policy, no benefits would be payable because: (i) he had not submitted sufficient evidence of his work activities and earnings prior to his reported disability; (ii) the available medical evidence did not support disability from his sedentary occupation; (iii) the criminal and civil forfeiture proceedings appeared to preclude him from engaging in his occupation before his reported neck disability arose; (iv) his claim fell within the Policy's Mental/Nervous Disorders exclusion to the extent his inability to work was caused or contributed to by the disabling mental health conditions he had reported to other insurers; and (v) the neck condition for which he sought

benefits was excluded under the Policy's Pre-Existing Conditions exclusion.  (DE 194-29 at ¶151.)

During the claim period, Defendant was never informed of Plaintiff's prior neck-related medical history.  (*Id.* at ¶140.)  Mr. Thomas Petersen, the Executive Vice President at Petersen, manages, oversees, and participates in Petersen's risk evaluation and underwriting for personal disability insurance policies.  (DE 193-56 at ¶1.)  According to Mr. Petersen: if Petersen had known about the February 1, 2012 thoracic spine MRI and treatment Plaintiff received for thoracic pain and disc herniations just days before he applied for the Policy, the entire spine would have been excluded from coverage; if Petersen had known about Plaintiff 's medical history related to his cervical and thoracic spine, the fact that he was experiencing pain in his right upper and lower extremities when he applied for the Policy, and the fact that he underwent neurological evaluation and testing the same day he signed the Back Warranty Endorsement, Petersen would not have issued any policy of insurance to Brand; to Mr. Petersen's knowledge, Petersen has never issued a policy covering a spinal condition(s) for which a prospective insured has disclosed recent abnormal imaging results along with ongoing pain symptoms necessitating specialized treatment during the underwriting process; to Petersen's knowledge, in his more than three decades of underwriting disability insurance, he has never heard of an insurer knowingly issuing coverage for such an obviously unacceptable risk; the condition and symptoms that Plaintiff sought treatment and diagnostic testing with Dr. Sun on March 1-2, 2012 were a material change in health from what Plaintiff described and submitted to Petersen in his application; and, if Plaintiff had notified Petersen of his medical visits with Dr. Sun on March 1-2, 2012 for upper and lower extremity symptoms as the Policy offer required, Petersen would not have issued any insurance policy to Plaintiff.  (*Id.* at ¶41-45.)

### G. Plaintiff's Claimed Disability

In November of 2014, Plaintiff separately submitted a claim for Social Security Disability Insurance benefits. (DE 197-1 at ¶3.) The Social Security Administration decision notes that Plaintiff was determined to be disabled since October 21, 2014, under sections 216(i) and 223(d) of the Social Security Act, and therefore unable to perform his job function as an administrator, company president, and managing partner. (*Id.*; DE 194-29 at ¶166; DE 196-20 at 16-18.)

In February 2015, Plaintiff submitted a form to Defendant stating he was unable to return to work, signed by Dr. Vaynman. (DE 194-29 at ¶123.) Dr. Vaynman testified that he did not complete any portion of that form and that the signature on the form is not his, nor did he authorize anyone to complete or sign the form on his behalf. (*Id.* at ¶¶124-125; DE 193-36 at 79-86.) Plaintiff denies forging Dr. Vaynman's signature. (DE 194-29 at ¶124.)

Plaintiff also underwent a right shoulder arthroscopy with Dr. David Tuckman on March 23, 2015. (DE 194-29 at ¶129.) Dr. Tuckman determined that Plaintiff was suffering from "gradual onset" pain associated with osteoarthritis in his acromioclavicular joint. (*Id.*) When Plaintiff returned to Dr. Tuckman on April 2, 2015, he complained of worsening shoulder pain and burning around his incisions, but Dr. Tuckman found that Plaintiff's physical exam was completely normal. (*Id.* at ¶130.) Dr. Tuckman referred Plaintiff to start physical therapy and return for a follow-up in six weeks, but Plaintiff did not return. (*Id.* at ¶132.) Dr. Tuckman restricted Plaintiff to refrain from returning to work for a month after the operation, although he did not know what Plaintiff's job duties entailed, and noted that work restrictions can vary depending on occupation. (*Id.* at ¶¶133-134.)

15

Defendant's orthopedic expert, Dr. Krishn Sharma, performed an independent medical examination of Plaintiff's spine and shoulder, and concluded that Plaintiff, "[f]rom an objective clinical standpoint, . . . should have been capable of returning to his normal occupational duties in January 2015," and that he was not disabled from his occupation. (DE 193-14.)

## III.  PROCEDURAL HISTORY

Plaintiff commenced this action initially *pro se* on November 2, 2015, and filed an Amended Complaint on June 16, 2016 seeking injunctive relief in the form of disability benefits, punitive damages and unspecified consequential damages based on bad faith by Defendant.[3] (DE 1; DE 31 at ¶¶ 13-16.)  After initially answering and filing a Counterclaim on April 14, 2017, Defendant subsequently filed an Amended Answer and Amended Counterclaim on November 19, 2019, denying any benefits were payable to Plaintiff, seeking recission of the Policy based on Plaintiff's fraudulent and material misrepresentations in the application and endorsements, and seeking declaratory relief based on the Policy never becoming effective due to Plaintiff's failure to disclose changes in health and failing to disclose prior neck conditions. (DE 48; DE 134.)  Plaintiff retained counsel on March 24, 2020.  (DE 150.)[4]

Both parties now move for summary judgment on all claims.  (DE 193; DE 196.) Plaintiff moves on his causes of action for breach of contract and breach of the implied covenant of good faith and fair dealing. (DE 31.)  Defendants move for summary judgment: as to their counterclaims for recission based on material misrepresentations in the application and fraud, misstatement and/or concealment in the claim; as to their counterclaims that the policy never

---

[3] Plaintiff's request for injunctive relief/declaratory judgment (DE 29) was denied as premature (Electronic Order dated July 19, 2016) and Plaintiff's motion for reconsideration of that Order (DE 36) was denied with leave to renew.  (Electronic Order dated Aug. 2, 2016.)  The motion was not renewed.
[4] This matter was consolidated, for discovery purposes only, with a separate action that Principal Life Insurance Company commenced against Plaintiff (*Principal Life Insurance Company v. Brand*, Case No. 15-CV-3804).

became effective due to undisclosed material changes in health condition, Plaintiff's failure to produce medical evidence to support his alleged total disability and permanent total disability, Plaintiff's non-covered legal disabilities/mental health conditions; as to their counterclaims barring Plaintiff's claim for coverage as a matter of law; dismissing Plaintiff's claim of breach of the covenant of good faith and fair dealing; and dismissing Plaintiff's claims for consequential and punitive damages.  For purposes of this Report and Recommendation, each claim is considered in turn, in the case that the District Court does not adopt one or more of the undersigned's recommendations as to a specific claim.

The Honorable Gary R. Brown referred the motions to the Honorable A. Kathleen Tomlinson for a Report and Recommendation, and this matter was then re-assigned to the undersigned. [5]  (Electronic Order dated July 11, 2021; Electronic Order dated Nov. 17, 2021.) On May 10, 2022, the Court heard oral argument and reserved its decision for the Report and Recommendation.  (DE 201; DE 202.)

## IV.   STANDARD

Summary judgment must be granted when there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The initial burden is on the movant to demonstrate the absence of a genuine issue of material fact, which can be met by pointing to a lack of evidence supporting the nonmovant's claim. *Celotex Corp. v. Catrett¸* 477 U.S. 317, 323, 325 (1986); *Feingold v. New York*, 366 F.3d 138, 148 (2d Cir. 2004). Once the movant meets its initial burden, the nonmovant may defeat

---

[5] Both parties previously filed their summary judgment motions on July 7, 2021 and the Court denied the motions without prejudice due to various filing errors. (DE 178; DE 179; DE 192.)

summary judgment only by adducing evidence of specific facts that raise a genuine issue for trial. Fed. R. Civ. P. 56(e); *Anderson*, 477 U.S. at 250; *Davis v. New York*¸ 316 F.3d 93, 100 (2d Cir. 2002). The Court is to believe the evidence of the nonmovant and draw all justifiable inferences in his favor, *Anderson*, 477 U.S. at 255, but the nonmovant must still do more than merely assert conclusions that are unsupported by arguments or fact. *BellSouth Telecomms., Inc. v. W.R. Grace & Co.*, 77 F.3d 603, 615 (2d Cir. 1996).  The role of the court at the summary judgment stage is not to *resolve* disputed issues of fact, but merely undertake an analysis to determine whether triable issue of fact exist.  That is, the court's function is "issue finding", not "issue resolution." *Carolina Cas. Ins. Co. v. Cap. Trucking Inc.*, 523 F. Supp.3d 661, 668 (S.D.N.Y. 2021) (citing *Gallo v. Prudential Residential Servs., Ltd. P'ship* 22 F.3d 1219, 1224 (2d. Cir. 1994)).

In considering multiple motions for summary judgment, "the Court applies the same summary judgment standard as that used for deciding individual motions for summary judgment." *Quanta Lines Ins. Co. v. Investors Cap. Corp.*, No. 06–civ–4624, 2009 WL 4884096, at *7 (S.D.N.Y. Dec. 17, 2009) (citing *Penguin Grp. (USA) Inc. v. Steinbeck*, 537 F.3d 193, 200 (2d Cir. 2008) (explaining that facts must be construed in the light most favorable to the non-moving party for each cross-motion for summary judgment)). "[E]ach party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).

Against this backdrop, the Court considers the cross-motions for summary judgment.

## V.    DISCUSSION

For ease of reference, the Court considers each of the arguments in the order set forth below:

- Whether Defendant is entitled to recission as a matter of law (*see* § V. A *infra*).

- Whether Defendant is estopped from rescinding the policy because of the acceptance of premium payments after learning of the misrepresentations (*see* § V. B *infra*).

- Whether coverage can be denied on the basis that the policy never became effective due to Plaintiff's failure to notify Defendant of material health changes (*see* § V. C. *infra*).

- Whether Plaintiff's alleged neck-related disability is excluded from coverage as a preexisting condition (*see* § V. D. *infra*).

- Whether Plaintiff's alleged fraud in the claim for disability bars coverage as a matter of law (*see* § V. E. *infra*).

- Whether Plaintiff has produced evidence to support a claim of total disability/permanent total disability, including the threshold issue of whether the Social Security Disability determination is admissible (*see* § V. F. *infra*).

- And finally, whether Plaintiff's claim for breach of the implied covenant of good faith and fair dealing, as well as Plaintiff's claims for punitive damages survives (*see* § II. G. *infra*).

### A.  Recission as a Matter of Law

Defendant argues that it is entitled to recission of the Policy as a matter of law because of Plaintiff's fraudulent and material misrepresentations in applying for the Policy.  (DE 193-1 at 16-21.)  Plaintiff argues that Defendant cannot rescind the Policy based on fraud because it does not have any underwriting manual, guidelines, or rules, and to establish a right to rescind, Defendant cannot rely on self-serving statements in which it asserts that it would not have otherwise issued the policy.  (DE 194 at 12-20.)  Hence, Plaintiff asserts, that even if there were omissions in his application, he did not intend to defraud Defendant.  (*Id.* at 20.)

New York Insurance Law § 3216(d) places a two-year time limit (incontestability period) on recission due to misstatements, *except* for fraudulent misstatements made by the applicant.

*See Dormer v. Northwestern Mut. Life Ins. Co.*, 408 Fed. App'x 452, 454 (2d Cir. 2011) (Summary Order) ("Under New York Insurance Law, an insurer may only rescind an insurance policy that . . . has been in effect for over two years if the insurer can 'identify a material misrepresentation in the [insured's] application that was intended to defraud the insurer.'") (citing *Dwyer v. First Unum Life Ins. Co.*, 41 A.D.3d 115, 837 N.Y.S.2d 635, 636 (1st Dep't 2007) (citing N.Y. Ins. Law § 3216(d)(1)(B)(i)).

Under New York law, to establish fraud, a party must prove: "(1) a material misrepresentation or omission of fact, (2) made with knowledge of its falsity, (3) with an intent to defraud, and (4) reasonable reliance on the part of the [party seeking to establish fraud], (5) that causes damage to [that party]." *Ehrlich v. Berkshire Life Ins. Co.*, No. 00 CIV. 9233(DLC), 2002 WL 368444, at *8 (S.D.N.Y. Mar. 7, 2022) (citation omitted). To establish fraud, each element must be proven by clear and convincing evidence. *Id.* (citation omitted). "Under New York's Insurance Law, a misstatement is not material 'unless knowledge by the insurer of the facts misrepresented would have led to a refusal by the insurer to make *such contract*.'" *Id.* (emphasis in original) (citing N.Y. Ins. Law § 3105(b)(McKinney 2000)). An insurer establishes materiality by presenting documentation as to "its underwriting practices such as its underwriting manuals, rules or bulletins which pertain to insuring similar risks." *Id.* To establish knowledge of the falsity of the statement(s), the insurer must show that the applicant either knew the statements to be untrue or that the applicant made the statements recklessly. *Bangue Franco-Hellenique de Com. Int'l et Maritime, S.A. v. Christophides*, 106 F.3d 22, 25 (2d Cir. 1997). Intent may be shown through circumstantial evidence absent direct evidence. *Ehrlich*, 2002 WL 368444, at *10.

The parties do not dispute that the Policy's statutorily imposed two-year incontestability period expired on February 28, 2014, as the Policy's effective date was March 1, 2012 (DE 193-13; DE 202 at 3).  Therefore, pursuant to N.Y. Ins. Law § 3216(d)(1)(B)(i), to rescind the Policy, Defendant must establish that Plaintiff made material misrepresentations with intent to defraud. Notably, Plaintiff does not dispute that he made misrepresentations regarding his cervical spine and thoracic spine history, but instead argues that Defendant failed to sustain its burden that the misrepresentations of facts were made with knowledge of falsity and intent to defraud.[6]  (DE 196-1 at 16-19.)  Plaintiff also argues that Defendant has not established materiality.  (*Id.*)  The Court first considers whether Defendant has established that Plaintiff knowingly made false statements with an intent to defraud, and next considers whether the alleged misrepresentations were material – that is, whether Defendant established that they reasonably relied upon the alleged false statements.

i.      **Knowledge of Falsity and Intent to Defraud**

Here, the sequence of events demonstrates that Plaintiff did knowingly submit false statements to Defendant with the intent to defraud.  Plaintiff concedes that on February 14, 2012, when he filled out the initial application documents, he did not disclose the years of treatment, tests, and injections that he had undergone for either his cervical spine or thoracic spine.  (DE 193-10; DE 194-29 at ¶¶54, 56.)   This included Question 22 regarding treatment for "Back/spine/neck" and Question 29 regarding x-rays and other diagnostic tests.  (DE 194-29 at ¶¶52, 55.)  Plaintiff also initially failed to respond to the portion of Question 21a.-c., asking him to provide information about his last healthcare provider visit, and when he finally provided a

---

[6] Nor does Plaintiff dispute Defendant's assertion that it has incurred damages, resulting from defending an action that never could have been brought if Plaintiff had been truthful in applying for coverage.  (DE 193 at n.1.)

response by completing the Application Amendment Endorsement, on February 22, 2012, he advised that he last saw Dr. Goldberg in June 2011 for a routine physical, and the results were normal.  (DE 194-29 at ¶¶57-59.)  In reality, Plaintiff had actually seen Dr. Yu between December 2011 through February 1, 2012, although he claims he could not recall if the visits were professional or personal, and that sometimes Dr. Yu would just knock him out with propofol and tell him she was going to make him feel better, and then they would go to dinner. (DE. 194-29 at ¶¶32, 68.)  During the underwriting process, when Defendant's doctor, Dr. Malaragno, saw Dr. Goldberg's record notation about "epidurals" and "cervical radic," Defendant gave Plaintiff another opportunity to disclose his treatment history through the Back Warranty Endorsement, but he failed to make the disclosure and signed the Endorsement on March 1, 2012.  (DE 197-1 at ¶¶18, 19, 20, 22; DE 193-56, Ex. H; DE 194-29 at ¶69.)  Even further, the same day that Plaintiff signed the offer, he went to his neurologist for "very severe" and "acute" pain and numbness in his right upper and lower extremities, and his neurologist's exam that day included review of his December 20, 2011 cervical MRI and February 1, 2012 thoracic MRI.  (DE 194-29 at ¶¶72-73.)

The Court is not persuaded by Plaintiff's attempt to insulate himself from the unmistakable misrepresentations made in the application process by arguing that he completed the application for the Policy at the broker's direction, and that Defendant had further material to draw on.  This is nothing short of an exercise in legal legerdemain, overlooking the clear, affirmative misrepresentations made.  (DE 197 at 10-11.)  "It is the duty of the policy holder to examine the policy and to correct any answers that are not correct or complete."  *Freidman v. Prudential Life Ins. Co. of America*, 589 F. Supp. 1017, 1023 (S.D.N.Y 1984).  Further, "the insurer has a right to rely on the representations in the written application if the application is

signed by the insured and attached to the policy" and the insurer "is under no duty to investigate the truthfulness of the representations." *Ehrlich*, 2002 WL 368444 at *11 (internal quotation marks and citations omitted). While such reliance must be reasonable, *id.*, "[u]nder New York law, an insurer is not required to verify medical records that the insured has represented were negative as to health conditions inquired about." *Freidman*, 589 F. Supp. at 1024 (citation omitted). The Court in *Ehrlich* aptly pointed out that to hold otherwise "would vitiate" Section 3216's provision permitting an insurer's right to contest fraudulent statements after an otherwise-applicable two-year limitation period. 2002 WL 368444 at *12. Here, Plaintiff had multiple opportunities to disclose his cervical and thoracic history and repeatedly failed to do so, both affirmatively and by omission. Plaintiff points to Defendant's lack of investigation of Plaintiff's medical history, but Defendant was not required to verify all of Plaintiff's medical records. Even so, Defendant did follow-up to determine what medical provider Plaintiff last treated with (which Plaintiff did not answer truthfully), Defendant had their own doctor review Plaintiff's medical records, and issued the Back Warranty Endorsement upon seeing the notations of epidurals and cervical radiculopathy. The record shows that even after this, Plaintiff chose to sign the Back Warranty Endorsement and withheld the exact information Defendant sought during the underwriting process.

Tellingly, Plaintiff was specifically seeking out additional coverage for a policy that would not exclude his entire back from coverage (since the Exceptional policy offer was not sufficient for his aims). It follows that by concealing his cervical and thoracic history, he would be more likely to obtain the coverage he was chasing. Thus, the record also contains circumstantial evidence of Plaintiff's intent to defraud Defendant. *See Ehrlich*, 2002 WL 368444, at *10 (finding that income amount was so obviously material to insurance benefit level

23

that insurer was certain to rely on Plaintiff's income statements in evaluating the policy and thus, Plaintiff must have intended that the insurer rely on those statements).

Plaintiff's other arguments are seemingly far-fetched – he attempts to blame his omissions on faulty memory which results from the "human condition," stating that humans often forget what tests doctors perform and what medications doctors prescribe.  (DE 196 at 15.) It is essentially inconceivable that Plaintiff could forget that he saw a doctor the very same day that he signed the Endorsements and completed the application.  Nonetheless, even "an innocent misrepresentation is sufficient to allow a recission of the contract."  *Cohen v. Mutual Ben. Life Ins. Co.*, 638 F. Supp. 695, 698 (E.D.N.Y. 1986).   Accordingly, the Court does not find any material issues of fact raised as to whether Plaintiff knowingly submitted false statements to Defendant with the intent to defraud.

### ii.    Materiality

> The purpose of the materiality inquiry is . . . to make certain that the risk insured was the risk covered by the policy agreed upon.  If a fact is material to the risk, the insurer may avoid liability under a policy if that fact was misrepresented in an application for that policy.

*Travelers Cas. and Sur. Co. of Am. v. Gold, Scollar, Moshan, PLLC*, No. 14cv10106 (DF), 2018 WL 1508573, at *9 (S.D.N.Y. Mar. 14, 2018) (quoting *Mut. Ben. Life Ins. Co. v. JMR Elecs. Corp.*, 848 F.2d 30, 34 (2d Cir. 1988).   "The burden of establishing the existence of a material misrepresentation is on the insurer."  *In re WorldCom, Inc. Sec. Litig.*, 354 F. Supp. 2d 455, 465 (S.D.N.Y. 2005).  Materiality of misrepresentation is typically a question of fact for the jury, but if there is clear and substantially uncontradicted evidence, the court may resolve the issue as a matter of law.  *Dwyer v. First Unum Life Ins. Co.*, 41 A.D.3d 115, 116, 837 N.Y.S.2d 636, 636 (1st Dep't. 2007).  A misrepresentation is material if the company has been induced to accept an application that it would have otherwise refused.  *New England life Ins. Co. v. Taverna*, No. 00-

CV-2400 (ILG), 2002 WL 718755, at *9 (E.D.N.Y. Mar. 1, 2002) (citations omitted). To make this determination, courts may consider sworn affidavits or testimony from qualified underwriting agents "who testif[y] that the insurer would not have issued the particular contract it did had the facts been disclosed, as well as underwriting guideline manuals or rules." *Id.* (citations omitted). "Conclusory statements by insurance company employees, unsupported by documentary evidence, are insufficient." *Cont'l Cas. Co. v. Marshall Granger & Co., LLP*, 6 F. Supp. 3d 380, 390 (S.D.N.Y. 2014) (citations omitted) *aff'd sub nom. Cont'l Cas. Co. v. Boughton*, 695 F. App'x 596 (2d Cir. 2017). "The test does not require the insurer to show that it would not have issued any policy at all to the insured – only that it would not have issued the policy in question." *Id.* quoting *Kantrowitz v. Paul Revere Life Ins. Co.*, No. 95-CV-2204, 1997 WL 128463, at *4 (S.D.N.Y. Mar. 19, 1997). An underwriter's affidavit is sufficient, without supporting documentary evidence, when based on all the evidence presented, no rational fact finder could conclude otherwise. *Marshall Granger & Co., LLP*, 6 F. Supp. 3d at 392.

Plaintiff argues that Defendant's reliance on the affidavit of Thomas Petersen (Executive Vice President of Petersen International Underwriters, Inc.) is not enough to establish materiality because the record is devoid of any underwriting manuals, guidelines, or rules pertaining to underwriting similar risks. (DE 194 at 9-12.) Plaintiff further argues that Underwriters' position is contradictory because their own physician reviewed Plaintiff's records and saw the notation for prior epidurals and cervical radiculopathy. (*Id.* at 11-12.) Thus, Plaintiff contends, Petersen's sworn statement that Defendant would not have issued the Policy is not the type of "irresistible" conclusion or so "obviously outside the scope of what a rational insurer would have insured" to warrant an exception to the general rule requiring documentary evidence in addition to an affidavit. (*Id.*) (citing *Marhsall Granger*, 6 F. Supp. 3d at 392.) Although Defendant

25

concedes that it does not have written underwriting guidelines applicable to Plaintiff's case (DE 194-29 at ¶11), Defendant asserts that the Back Warranty Endorsement should be considered the requisite "documentation concerning [their] underwriting practices" to show they "would not have issued the same policy if the correct information had been disclosed in the application." (DE 197 at 6) (citing *Schirmer v. Penkert*, 41 A.D.3d 688, 691, 840 N.Y.S.2d 796, 799 (2007)). Defendant also argues that even if the Back Warranty Endorsement is not considered supporting documentation, Petersen's affidavit alone is sufficient because the undisclosed information was so obviously material to the risk, that a rational fact finder could not conclude otherwise.  (DE 197 at 11.)

The Court is unpersuaded by Defendant's reliance on *Schirmer*, which appears to have been taken out of context.  *Schirmer* reiterates the well-established law in New York that documentation of underwriting practices includes "underwriting manuals, bulletins, or rules pertaining to similar risks . . ."  *Schirmer*, 41 A.D.3d 688, 691, 840 N.Y.S.2d 796, 799. Defendant has not pointed to any authority, and the Court is not aware of any, in which an endorsement to a policy was held to be satisfactory documentation concerning an underwriting practice for purposes of establishing materiality.  Moreover, Petersen's affidavit contains only what appear to be self-serving *general* statements that to his knowledge Petersen has never issued a policy covering a spinal condition(s) for which a prospective insured disclosed recent abnormal imaging results and ongoing pain symptoms that necessitated specialized treatment during the underwriting process.  Where there are no underwriting manuals, rules, bulletins, or other forms of guiding documentation pertaining to insuring similar risks, the individual putting forth an affidavit must include that individual's underwriting experience, i.e., affidavit testimony regarding an individual's underwriting practice with respect to similar applicants.  *Ocean Walk,*

26

*Ltd. v. Those Certain Underwriters at Lloyd's London*, No. 03-CV-5271 (DRH)(ARL), 2006 WL 2689626, at *8 (E.D.N.Y. Sep. 19, 2006).

However, there are instances where precise underwriting practices are not necessary to establish materiality.  *See Marshall Granger & Co., LLP*, 6 F. Supp. 3d 380, 392 ("While in many cases the question of whether the insurer would have issued the policy on the same terms depends heavily on the insurer's precise underwriting practices, this is not such a case.").  In *Marshall Granger*, the insured applied for a professional liability policy while it was in the midst of perpetrating a securities fraud and gave inaccurate answers to multiple questions during the policy application process.  *Id.* at 390.  While the insurer failed to show materiality by producing documentation concerning its underwriting practices, the Court nonetheless found that based on all the evidence presented, no rational fact finder could possibly conclude that such misrepresentation was not material.  *Id.* at 392.  The Court noted that this outcome could have been different if discovery uncovered evidence to undermine such obvious materiality, such as evidence that the insurer did not look at the application.  *Id.* at 393 n.14.  Here, the Court finds the evidence in line with the Court's reasoning in *Marshall Granger*, as "[c]ommon sense dictates that it is simply impossible to believe that, had the full facts . . . been disclosed on the Application, [the insurer] would still have issued the Policy on the same terms."  *Id.* at 392. Indeed, discovery revealed that Defendant *did* look at Plaintiff's application in detail and specifically followed up with Plaintiff regarding his history of back treatment by issuing the Back Warranty Endorsement.  Time after time, Plaintiff – who was specifically seeking additional coverage without a full spine exclusion – concealed and/or outright denied his cervical and thoracic issues and history.  Thus, the Court finds that no reasonable finder of fact could conclude that Defendant would have issued the same policy had Plaintiff truthfully filled out the

original application questions, truthfully filled out the Back Warranty Endorsement, or truthfully advised Defendant of the treatment he sought between the time the application process began to the time the Policy was issued. *See 282 Mountainview Drive LLC v. Norguard Ins. Co.*, No. 19-CV-2048 (CS), 2021 WL 3037450, at *10 (S.D.N.Y. July 14, 2021) (noting that even without specific provisions in underwriting or backdating guidelines to support insurer's affidavit, it was obvious to the Court "that the fact that the property the risk of which [was] being underwritten [had] in fact already burned down [was] certainly information an insurer would need to know before issuing or changing a policy for that property"); *Chicago Ins. Co. v. Fasciana*, No. 04 Civ. 7934(LAP), 2006 WL 3714310, at *6 (S.D.N.Y. Dec. 13, 2006) (finding that insurer's affidavit alone was sufficient basis for a finding of materiality because it was not conclusory as it set out facts and the conclusion to be drawn from those facts, and stated that any underwriting guidelines would not address the underwriting effect of the applicant's fraudulent acts because it is so obvious that any insurer would not insure someone engaged in such conduct); *Equitable Life. Assur. Soc. of U.S. v. O'Neil*, 67 A.D.2d 883, 413 N.Y.S.2d 714 (1st Dep't. 1979) ("[t]he conclusion is irresistible that had plaintiff been aware of the true facts[,] the disability premium waiver provision would not have been included in the policy and in these circumstances there is no need for a hearing to introduce evidence of the insurer's underwriting rules or practices…") (internal citations omitted)(alteration added); *cf. United Nat'l Ins. Co. v. Program Risk Mgmt., Inc.*, 1:13-CV-741, 2016 WL 1275047, at * 11 (N.D.N.Y. Mar. 31, 2016) (insurer's reliance on affidavit without citation to relevant underwriting manuals or guidelines, did not establish materiality as a matter of law in light of changing statutory and regulatory landscape surrounding self-insured trusts [the type of risk being underwritten] at that time, and the lack of documentary

28

support that the insurer would not have issued the policy otherwise).[7]  Accordingly, Defendant has established that Plaintiff's misstatements and omissions were material.

The undersigned thus respectfully recommends that Defendant's motion for recission of the Policy as a matter of law be granted, as the record before the Court establishes that Plaintiff made fraudulent representations in obtaining the Policy.  The undersigned thus respectfully recommends that Defendant's motion for recission of the Policy as a matter of law be granted, as the record before the Court establishes that Plaintiff made fraudulent representations in obtaining the Policy.  Accordingly, the undersigned recommends judgment on Defendant's counterclaim for recission based on material misrepresentations in the application, and that Plaintiff's claim for breach of contract as to those claims be dismissed.

## B.  Whether Defendant is Estopped from Rescinding the Policy Because of Accepting Premium Payments After Learning of Misrepresentations

Plaintiff argues that Defendant is estopped from rescinding the Policy because Defendant accepted premium payments after learning facts that it now relies on in support of recission.  (DE 196-1 at 20-21.)  Defendant rebuts this argument, explaining that Petersen requested the payment as part of a regularly scheduled quarterly premium due, and that in fact, there is no evidence showing that Plaintiff actually made the payment.  (DE 197 at 20-23.)

An insurer must assert the right to rescind without unreasonable delay.  *Banque Arabe Et Int'l D'Investissement v. Maryland Nat. Bank*, 850 F. Supp. 1199, 1211 (S.D.N.Y. 1994) (citing *Allen v. Westpoint-Pepperell, Inc.*, 945 F.2d 40, 47 (2d Cir. 1991).  "A party must assert his right to rescind after having had notice of the fraud and the opportunity to investigate."  *Id.*  If an

---

[7] The Court notes that neither party acknowledges that "[a] misrepresentation that an applicant for life or accident and health insurance has not had previous medical treatment, consultation or observation, or has not had previous treatment or care in a hospital or other like institution, . . . shall be presumed to have been material."  N.Y. Ins. Law § 3105(d)).

insurer accepts premiums after learning of facts that allow the policy to be canceled, the insurer waives the right to rescind. *Am. Gen. Life Ins. Co. V. Salamon*, No. 09-CV-5428 (KAM)(SMG), 2011 WL 976411, at *3 (E.D.N.Y. Mar. 16, 2011). A party does not need to assert a recission immediately upon notice of fraud, but "is afforded a reasonable period after notice of the fraud within which to consider whether or not to rescind." *Banque Arabe Et Int'l D'Investissement*, at 1211. (citing John M. Friedman, "Delay as a Bar to Rescission," 26 *Cornell L. Quarterly* 426, 449 (April 1941)). Even if an insurer knew of misrepresentations before disclaiming coverage, the claimant must still establish that it paid the premium after the insurer acquired that knowledge. *Precision Auto Accessories, Inc. v. Utica First Ins. Co.*, 52 A.D.3d 1198, 1202, 859 N.Y.S.2d 799, 803 (4th Dep't. 2008).

Here, Defendant's claim administrator, DMS, sent an acknowledgement letter to Plaintiff on November 10, 2014, advising that they would review Plaintiff's claim and directed Plaintiff to continue making premium payments. (DE 196-2 at ¶41; DE 196-27.) On June 10, 2015, DMS recommended to Defendant that they rescind the Policy based on concerns related to a "suspicion of fraud." (DE 196-2 at ¶46.) Plaintiff asserts that he paid a premium in June but is unable to submit any evidence to that effect. (DE 196-1 at 21.) Indeed, Counsel confirmed during oral argument that a June check was never found and stipulated on the record that March 1, 2015 was the last date that Plaintiff paid a premium. (DE 202 at 47-48.) Moreover, Petersen's affidavit provides that the last premium payment was made on March 1, 2015, more than 2 months before DMS received an underwriting opinion from Petersen regarding the materiality of Plaintiff's misrepresentations, and over 3 months before Defendant had the information on which they based their decision to rescind the Policy. (DE 197-1 at ¶¶59-66, 69.) On June 25, 2015, Defendant completed their claim review, instructed DMS to rescind the Policy, and Petersen

complied with Defendant's directive (via DMS) to process a rescission endorsement with check payable to Plaintiff for all premiums paid.  (DE 197-1 at ¶¶ 66-68.)  The recission letter and check were issued to Plaintiff on June 29, 2015 and a revised recission letter and check were subsequently sent.  (DE 194-29 at ¶¶ 149, 150.)

Based on the record before the Court, including the admissions made during oral argument, Plaintiff has failed to establish that Defendant is estopped from rescinding the Policy for failure to timely rescind the policy.  First, the record is clear that the last premium Plaintiff paid was in March of 2015 while Defendant's investigation was still underway.  Moreover, the period between November of 2014 and March of 2015 (when the last premium was paid) is not an unreasonable length of time to investigate leading up to recission of a policy – even if there was evidence that Plaintiff paid the June 2015 premium, such a period is still reasonable.  *See Admiral Ins. Co. v. Brookwood Mgmt. #10, LLC*, 16-CV-0437(SJF)(SIL), 2018 WL 5622595, at *24 (E.D.N.Y. Mar. 30, 2018) ("Although there is no bright-line rule as to when the length of a recission investigation becomes unreasonable, cases typically find that a delay of over one (1) year is unreasonable.") (internal citations and alterations omitted); *Chi. Ins. Co. v. Kreitzer & Vogelman*, No. 97 CIV. 8619 RWS, 2000 WL 16949, at *10 (S.D.N.Y. Jan. 10, 2000) (finding that record did not support holding that insurer waived recission as insurer's, ". . . delay from the Spring of 1997 to November of 1997 is susceptible to alternate interpretations."); *see also Precision Auto*, 52 A.D.3d 1198, 1203, 859 N.Y.S.2d 799, 803-04 (2008) (holding that eight-month delay in disclaiming coverage was not untimely, and even if it was, plaintiff was not prejudiced).

Accordingly, the undersigned respectfully recommends that the portion of Plaintiff's motion seeking to estop Defendant from rescinding the policy based on accepting premiums after learning of facts that they relied on in support of recission should be denied.

### C. Whether Coverage Can Be Denied on the Basis that the Policy Never Became Effective Due to Plaintiff's Failure to Notify Defendant of Material Health Changes

Defendant argues that the Policy never became effective because Plaintiff failed to notify Defendant of material health changes between the time of his application and the Policy issuance date. (DE 193-1 at 21-22.) Defendant contends that Plaintiff failed to meet this condition because between the time that he signed the application on February 14, 2012 and the date the Policy was issued on March 2, 2012, he treated with his neurologist for "very severe" pain and numbness throughout his right upper and lower extremities. (*Id.*) Further, Defendant argues that Plaintiff actually returned to the neurologist the same day the Policy was issued, and underwent EMG testing, but he did not disclose these visits and purported material changes in health to Defendant. (*Id.*) Plaintiff argues that Defendant's arguments are barred because such a theory would allow circumvention of New York Insurance Law § 3216(d). (DE 194 at 21.)

Plaintiff attempts to hang his hat on *Carden v. First Unum Life Ins. Co.*, 46 F. Supp. 2d 240 (S.D.N.Y. 1999), holding that

> [u]nder New York Insurance law §3216(d), *absent fraud*, a condition precedent to a contract of insurance which requires the insured to have provided true and complete statements in an application for insurance as of the date on which the initial premium is paid, cannot operate to void the policy where the insurance carrier's disclaimer is made more than two years after the policy was issued.

(DE 194 at 16-17 citing *Carden*, at 244 (emphasis in original).)

For the reasons discussed in § V.A. above, the Court finds that Defendant has established fraud as a matter of law. Moreover, the condition precedent in *Carden* centered on whether all *statements* the plaintiff made in the application for insurance remained true and complete as of

the date of the first premium payment. *Id.* at 243; *compare with Smith v. Pruco Life Ins. Co. of N.J.*, 882 F. Supp. 2d 391, 395 (E.D.N.Y. 2012) (Under New York Law, "unchanged health" condition precedent requires applicant's *health* to remain the same between date of application, delivery of the policy and collection of the premium). Rather than seeking to void the Policy based on misstatements, here, Defendant is seeking to void the Policy based actual health changes Plaintiff was obligated to disclose. Indeed, the alleged breach of the Policy's change-in-health condition focuses on actual events that occurred between the time of the application and the Policy issuance date, *i.e.*, the March 1-2, 2012 treatment Plaintiff underwent.

Accordingly, the undersigned recommends that Defendant be granted summary judgment on the grounds that the Policy never became effective due to Plaintiff's failure to satisfy a condition precedent, by notifying Defendant of changes in his health condition.

**D. Whether Plaintiff's Alleged Neck-Related Disability is Excluded from Coverage as a Preexisting Condition**

Defendant also argues that Plaintiff's alleged neck-related disability is excluded from coverage as a preexisting condition. (DE 193-1 at 26-27.) As Defendant notes, the Policy states: "No benefits will be paid due to Sickness or Injury caused by, contributed to by or related to . . . Pre-Existing Conditions." (DE 194-29 at ¶86.) Again conceding that New York Insurance Law §3216(d)(1)(B)(ii) precludes an insurer from denying a claim for disability commencing after 2 years from policy issuance based on a preexisting condition, Defendant asserts, based on the Policy's definitions of "Pre-Existing Conditions," and "Sickness, Illness," (discussed *supra* at Section II.(d.)) that they may deny coverage because the pre-existing neck condition was fraudulently concealed when Plaintiff applied for the Policy. *See New England Mut. Life Ins. Co. v. Doe*, 93 N.Y. 2d 122, 131, 710 N.E.2d 1060, 1063 (1999) (holding that a carrier may protect itself from fraudulently concealed preexisting conditions "by including a provision in its

33

incontestability clause creating an exception for fraudulent misstatements") (internal quotation marks and citation omitted).  Plaintiff does not dispute the definitions of "Pre-Existing Conditions," or "Sickness, Illness," and reiterates his same arguments that Defendant has not established fraud.  (DE 194 at 20-21.)

Here, the Court agrees that even though Defendant is precluded under New York Insurance Law §3216(d)(1)(B)(ii) for denying the neck-related claim since the policy was issued over two years from such denial, Defendant may still deny the claim pursuant to the fraud exclusion in the policy (DE 194-29 at ¶85).  For the reasons discussed above in §V.A., the Court finds that Plaintiff did fraudulently conceal his pre-existing neck condition when he applied for the Policy, and thus, Defendant is entitled to rely on the Fraud provision which states that upon committing fraud, a misstatement or concealment, the "certificate may become void and no benefits will be payable."  (DE 193-13.)

Accordingly, the undersigned recommends that Defendant be granted summary judgment on its claim that Plaintiff's alleged neck-related disability is excluded from coverage as a preexisting condition.

**E.  Whether Plaintiff's Alleged Fraud in the Claim for Disability Bars Coverage as a Matter of Law**

Defendant submits that Plaintiff also fraudulently concealed his condition when making the disability claim itself.  (DE 193-1 at 28.)  Defendant contends that based on the Fraud provision of the Policy, which states that upon committing fraud, a misstatement or concealment, the "certificate may become void and no benefits will be payable," coverage is barred as a matter of law.  (DE 193-1 at 28-29.)  Additionally, as to the materiality prong, Defendant argues that the false claim submission was material because it concealed information central to Defendant's investigation. *Clerical Apparel*, 209 F.R.D. 316, 320 (E.D.N.Y. 2002) (holding that

misrepresentations were material as a matter of law because they impeded company's investigation of plaintiff's claim).

It is undisputed that the claim form asked Plaintiff whether he ever had the same or similar condition before, to which he responded: "Never any issues to this area of spine + these symptoms."  (DE 193-29 at ¶121.)  Notably, Plaintiff does not submit any opposition to this argument.  Accordingly, for the reasons discussed above in §V.A., the Court finds that Plaintiff did fraudulently conceal his pre-existing neck condition.  Further, Plaintiff's response on the claim form was material. *Fine v. Bellefonte Underwriters Ins. Co.*, 725 F.2d 179, 184 (2d Cir. 1984) (finding that false sworn answers are material if they may have affected the attitude of the insurer, or if such statements were made to discourage, mislead or deflect the insurer's investigation into an area seemingly relevant to investigate, which could result in voiding coverage).  Thus, the undersigned recommends that Defendant be entitled to bar coverage based on the Plaintiff fraudulently concealing his neck condition when making the disability claim itself.

**F. Whether Plaintiff has Produced Evidence to Support a Claim of Total Disability/Permanent Total Disability**

The Court again notes that each of the above recommendations, § V.A. – § V.E., would independently result in denying Plaintiff coverage under the Policy.  In light of the foregoing recommendations, the Court need not analyze whether Plaintiff has produced evidence to support a claim of total disability and/or a permanent total disability.  However, since the motions were referred to the undersigned for a Report and Recommendation, the undersigned will address the parties' arguments as to total disability and permanent total disability, in the event the District Judge concludes otherwise on the above recommendations.

**i.    Is the Social Security Disability Insurance Determination Plaintiff Relies Upon**

**Admissible?**

As a threshold issue, the Court first considers whether the Social Security Disability Insurance determination ("SSDI determination") is admissible. Defendant moves to strike this evidence arguing that the Social Security Disability Insurance determination ("SSDI" determination) was not timely disclosed in Plaintiff's Rule 26 disclosure pursuant to Fed. R. Civ. P. 37(c)(1), and is inadmissible under Fed R. Evid. 401 and 403. (DE 195 at 13-14; DE 197 at 8; DE 197-1 at ¶3.) Plaintiff glosses over this issue in the submitted motions, but during oral argument asserted that the SSDI determination was disclosed in the separate case, No. 15-CV-3804, that Principal Life Insurance Company commenced against Plaintiff, which was on a consolidated discovery track with this matter. (DE 202 at 31.) However, that argument holds no weight – the Court notes that in 15-CV-3804, Principal similarly asserted that the SSDI determination had not been disclosed pursuant to Rule 26. (*See* DE 303 in 15-CV-3804.)

Under Federal Rule of Civil Procedure 37, a party that fails to disclose information or identify a witness as required by Federal Rule Civil procedure 26(a) and (e) "is not allowed to use that information or witness to supply evidence on a motion . . . unless the failure was substantially justified or harmless." Fed. R. Civ. P. 37(c)(1). Such preclusion is meant "to prevent the 'sandbagging' of an opposing party with new evidence." *Rienzi & Sons, Inc. v. N. Puglisi & F. Industria Paste Alientari S.P.A.*, No. 08-CV-2540 (DLI)(JMA), 2011 WL 1239867, at *4 (E.D.N.Y. Mar. 30, 2011) (citations omitted); *see Lopez v. City of N.Y.*, No. 11-CV-2607 (CBA)(RER), 2012 WL 2250713, at *1 (E.D.N.Y. June 15, 2012) (Summary Order) (noting that "[t]he combined purpose of [Rules 26 and 37] is to avoid surprise or trial by ambush") (citation omitted). As such, in the "absence of prejudice" to the complaining party, courts have allowed the admission of "harmless" evidence. *BF Advance, LLC v. Sentinel Ins. Co., Ltd.*, 16-CV-5931 (KAM)(JO), 2018 WL 4210209, at *6 (E.D.N.Y. Mar. 20, 2018) (citing *Ritchie Risk-Linked*

36

*Strategies Trading (Ireland), Ltd. v. Coventry First LLC*, 280 F.R.D. 147, 159 (S.D.N.Y. 2012)). "In deciding whether to exercise its discretion to preclude evidence submitted in violation of Rule 26(a), the court considers: (1) [the party's] explanation for their failure to comply with the disclosure requirement; (2) the importance of the testimony of the potentially precluded witness; (3) the prejudice suffered by the opposing party as a result of having to prepare to meet the new testimony; and (4) the possibility of a continuance." *Id.* (citing *Patterson v. Balsamico*, 440 F.3d 104, 117 (2d Cir. 2006)).

Here, the first and fourth factor weigh in favor of striking the evidence. First, Plaintiff has no explanation for failing to comply with the disclosure requirement, and inaccurately represented that the disclosure was completed in case no. 15-CV-3804 and was therefore accessible to Defense Counsel since the cases were consolidated for discovery. In reality, this same exact issue was before the Court in 15-CV3804 and the Court did not find Counsel's excuse persuasive there either (namely that Mr. Brand had proceeded *pro se* for a majority of the case and hence did not understand his obligations to supplement Rule 26 disclosures, despite Counsel's appearance in the case over a year before dispositive motions were filed). The fourth factor weighs slightly in favor of preclusion of the SSDI determination because continuance would require reopening discovery. *See BF Advance, LLC*, 2018 WL 4210209, at *8 ("[T]he facts that discovery was closed on consent of the parties six months before plaintiffs submitted the [evidence], and that the parties have fully briefed the summary judgment motion, weigh against the possibility of a continuance.") (citing, *e.g.*, *Lujan v. Cabana Mgmt., Inc.*, 284 F.R.D. 50, 75 (E.D.N.Y. 2012)) (finding that close of discovery weighed slightly in favor of preclusion because continuance would require reopening discovery).

The next two factors, however, weight toward allowing the evidence. The SSDI determination is the only evidence Plaintiff relies on to prove that he is totally disabled under the Policy. (DE 194 at 20-21; DE 194-6.) Thus, the evidence is key to Plaintiff's case and therefore weighs against preclusion. Further, Defendant will not be prejudiced if the evidence is introduced because Plaintiff admitted at his deposition in 2020 that he was reaping SSA benefits. (DE 193-9 at 463-68; DE 202 at 32, 34-35.) Although Defendant claims that a request for the SSA records was made, which Plaintiff failed to respond to, Defendant seemingly did not press the issue by following up or moving to compel the records. (*Id.*) The Court does not find that introduction of the SSDI determination would therefore subject Defendant to "trial by ambush." *See Lore v. City of Syracuse*, No. 5:00-CV-1833, 2005 WL 3095506, at *2 (N.D.N.Y Nov. 17, 2005) ("While it may be true that plaintiff failed to adhere to the letter of the discovery rules, the court is convinced that defendants were sufficiently aware of the existence and relevance of the persons in question so that defendants are not being subjected to trial by ambush.").

On balance, the Court finds that Plaintiff's failure to disclose the SSDI determination was ultimately harmless and thus, the undersigned recommends that this evidence not be stricken for failure to comply with Rule 26. This does not end the inquiry as Defendant also argues that the SSDI determination is hearsay, irrelevant, and not probative of Plaintiff's disability. (DE 195 at 14; DE 197-1 at ¶3.)

Federal Rule of Evidence 401 provides that evidence is relevant if it "has any tendency to make a fact more or less probable than it would be without the evidence" and "the fact is of consequence in determining the action." Fed. R. Evid. 401. The Second Circuit has characterized the relevance threshold as being "very low." *United States v. White*, 692 F.3d 235, 246 (2d Cir. 2012) (quoting *United States v. Al-Moayad*, 545 F.3d 139, 176 (2d Cir. 2008)).

Even if evidence is relevant, a District Court may nonetheless exclude it "if its probative value is substantially outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Fed. R. Evid. 403; *see Old Chief v. United States*, 519 U.S. 172, 184–85 (1997) (discussing the contours of Rule 403).

The Court finds the SSDI determination relevant and thus, not excludable under Rule 403.   Whether Plaintiff is unable to "engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment"[8] undoubtedly bears on whether Plaintiff is able to perform the duties of a position of the same general character as his previous job, requiring similar skills and training, and involving comparable duties, as stated in the Policy. Because the SSDI determination has a tendency to make Plaintiff's disability more or less probable, the evidence is relevant.  Fed R. Evid. 401; *Principal Life Ins. Co. v. Brand*, 15-CV-03804 (GRB) (JMW), 2021 WL 4122990, at *11 (E.D.N.Y. Sep. 8, 2021) *report and recommendation adopted by* 2021 WL 4458843 (E.D.N.Y. Sep. 29, 2021) *reconsid. denied*, *notice of appeal filed*, DE 315 (2d Cir. Nov. 23, 2021) (finding that the SSDI determination had tendency to make insured's disability more or less probable and was therefore relevant); *McElgunn v. CUNA Mut. Grp.*, No. CIV. 06-5061-KES, 2009 WL 1514398, at *8 (D.S.D. May 27, 2009) (holding that entitlement of social security benefits was relevant to the question of whether claimant was totally disabled under the insurance policy in question).  The Court acknowledges Defendant's position that (1) the SSA determination accorded more weight to the medical opinions of Plaintiff's treating physicians pursuant to an agency regulation with no application in this case (DE 197-1 at 4, citing 20 CFR § 404.1527(c)(2)), and (2) the

---

[8]  42 U.S.C. § 423(d)(1)(A) (defining disability under the Social Security administration).

determination was not based solely on the neck condition that forms Plaintiff's claim, but rather included other physical and psychiatric conditions expressly excluded from coverage (DE 197-1 at 4). However, the Court finds that such discrepancies point more toward the weight of the evidence, rather than resulting in unfair prejudice, confusing the issues or misleading the jury.

Defendant also contends that the SSDI determination is inadmissible hearsay. (*Id.*) Here, the Court agrees that the disputed evidence qualifies as hearsay, defined as out of court statements offered for the truth of the matter asserted. *See* Fed. R. Evidence 801, 802. Nonetheless, the Court finds the SSDI determination admissible under the "public records and reports exception," which permits admission of:

> Records, reports, statements, or data compilations, in any form of public offices or agencies, setting forth . . . (C) in civil actions and proceedings . . . factual findings resulting from an investigation made pursuant to authority granted by law, unless the source of information or other circumstances indicate lack of trustworthiness.

Fed R. Evid. 803(8).

Here, the factual findings, rather than the legal conclusions, of the SSDI determination as a public record compiled by a Social Security Administrative Law Judge, are admissible under the public records exception to the general prohibition of hearsay evidence. *See Principal Life Ins. Co.*, 2021 WL 4122990, at *12. Accordingly, the undersigned respectfully recommends – if the District Court must reach this point in the analysis – that Defendant's motion to strike be denied, and that the factual findings in the SSDI determination be considered in analyzing whether an issue of fact exists as to Plaintiff's disability.

ii.    **Are There Material Issues of Fact as to Plaintiff's Disability?**

Aside from relying on the SSDI determination, Plaintiff argues that "occupation" is not defined in the Policy, that Defendant admitted they did not know Plaintiff's occupation at the time of underwriting, and that Defendant cherry-picked occupational tasks to rely on in order to

deny Plaintiff disability benefits.  (DE 194 at 23-25.)   Defendant argues that even if the Policy

was in full force and effect, Plaintiff has not produced any medical opinion evidence to support a

claim of total disability, or permanent total disability, as required under the Policy (aside from

the SSDI determination which they argue should be precluded/is inadmissible).  (DE 193-1 at

23-25.)  Defendant points out that Plaintiff provided an APS form that Dr. Vaynman purportedly

signed, which listed a Total Disability period over 90 days, but Dr. Vaynman testified under oath

that he never signed the form.  (DE 194-29 at ¶¶123-26; DE 193-36 at 79-86.)  Further,

Defendant argues that the Policy *does* identify Plaintiff's occupation (as President of Daso

Cleaning & Restoration) and that their disclosed expert, Dr. Sharma, determined that Plaintiff is

not currently disabled and was not disabled for any duration to satisfy the 90-day Elimination

Period for Total Disability, nor the 63-month period for Permanent Total Disability.  (DE 193-1

at 24; DE 194-29 at ¶¶155-62.)  Additionally, Defendant asserts that even if Plaintiff's alleged

neck-related disability was supported by medical evidence, Plaintiff is still not covered because

the disability arose only after *legal* disabilities resulting from his own criminal conduct, and after

he claimed a disability to a separate insurer (Principal) due to mental health conditions excluded

from coverage.  (DE 193-1 at 25-26.)

The claimant has the burden of establishing existence of a total disability within the

meaning of the policy.  *Klein v. Nat'l Life of Vt.*, 7 F. Supp. 2d. 223, 226 (E.D.N.Y. 1998) (citing

*Goell v. U.S. Life Ins. Co.*, 269 A.D. 573, 55 N.Y.S.2d 732, 732-33 (1st Dep't 1943)); *see also*

*Shapiro v. Berkshire Life Ins. Co.*, 212 F.3d 121, 124 (2d Cir. 2000) ("Under New York, [the

claimant] bears the burden of proving that he is totally disabled within the meaning of the

policies.") (citation omitted).[9]  "[T]he definition of disability in the insurance policy is the

---

[9] Plaintiff makes a threshold argument that this entire argument should not be considered because
Defendant failed to raise this issue either in their denial letter (DE 194 at Ex. H) or in their counterclaims

relevant definition for the purpose of assessing whether the [claimant] has met his burden."

*Barbu v. Life Ins. Co., of N. Am.*, 35 F. Supp. 3d 274, 288 (E.D.N.Y. 2014); *see Van Wright v.*

*First Unum Life Ins. Co.*, 740 F. Supp. 2d 397, 402 (S.D.N.Y. 2010) ("Ultimately, the question

of whether or not a claimant is disabled must be judged according to the terms of the [p]olicy.").

> Under the Policy, Permanent Total Disability and Total Disability are defined as:

> **Permanent Total Disability** means that in the opinion of Competent Medical Authority You will not recover from the effects of a Sickness or Injury to the extent that You will ever be able to engage in Your occupation.

> **Total Disability** means that due to Sickness or Injury You cannot engage in Your occupation.

(DE 193-13 at 4-5.)  To assess a claimant's occupation, the Court must

> [look] to the professional activities in which the insured was regularly engaged at the time of the onset of the insured's disability. If a claimant is able to perform the duties of a position of the same general character as the insured's previous job, requiring similar skills and training, and involving comparable duties, he is not totally disabled.

*London v. Berkshire Life Ins. Co.*, 71 F. App'x 881, 884 (2d Cir. 2003) (summary order)

(quoting *Klein*, 7 F.Supp.2d at 227 (citation omitted)).  The relevant inquiry is into the nature of

the work actually performed.  *Id.* (citation omitted).

> Here, there are material issues of fact regarding whether Plaintiff is totally disabled under

the Policy.  Plaintiff's daily duties as president of cleaning/restoration businesses included

administration, management, and development.  (DE 193-10.)  The Court does not afford any

weight to the APS form that Dr. Vaynman allegedly submitted on behalf of Plaintiff, as Dr.

Vaynam testified under oath that the signature on the APS was forged.  (DE 194-29 at 123-126;

---

(DE 134).  (DE 194 at 23.)  Plaintiff cites cases for the broad proposition that arguments made for the first time at the summary judgment stage should not be considered, but fails to acknowledge that it is indeed his burden to prove a total disability.  *See Klein*, 7 F. Supp. 2d. at 226.

DE 193-36 at 79-86.)  However, the SSDI determination dated June 23, 2016, concluded that

Plaintiff has been disabled, as defined by the SSA, since October 21, 2014, and is therefore

unable to perform his job function as an administrator, company president, and managing

partner.  (DE 196-20 at 16-18.)  This determination was based on factual findings after a review

of Plaintiff's medical records from various treating physicians, an orthopedic examination, a

psychiatric examination, and a vocational examination.  (*Id.* at 11-16.)  However, upon

examining Plaintiff, Defendant's orthopedic expert, Dr. Sharma, concluded that Plaintiff, "[f]rom

an objective clinical standpoint, . . . should have been capable of returning to his normal

occupational duties in January 2015," and that he was not disabled from his occupation.[10]  (DE

193-14.)

Whether Plaintiff is considered disabled is further complicated in light of the conflicting

evidence regarding whether Plaintiff stopped working due to the criminal indictment or his

alleged physical and/or mental disabilities.[11]  *See Jacobs v. Nw. Mut. Life. Ins. Co.*, 103 A.D.3d

78, 83, 957 N.Y.S.2d 347 (2d Dep't 2012) ("A legal disability includes all circumstances in

which the law does not permit a person to engage in his or her profession even though he or she

may be physically and mentally able to do so") (citations omitted).  Plaintiff argues that his

businesses were operational after his indictment and the downturn in business was actually due

to his neck disability.  (DE 194 at 27.)  The record before the Court demonstrates disputed facts

to this end: *i.e.*, whether Plaintiff continued operating businesses after the June 2014 search and

seizure (DE 194-29 at ¶103), whether Plaintiff's psychiatrist's (Dr. Zillmann) statement that

---

[10] The Court does not find Dr. Tuckman's reports/testimony regarding Plaintiff's shoulder to weigh one way or another regarding whether Plaintiff was disabled under the Policy – Plaintiff did not continue to follow-up with Dr. Tuckman; nor did Dr. Tuckman have personal knowledge of Plaintiff's occupational duties.  (DE 194-29 at ¶¶133-34.)

[11] Brand does not oppose that certain Exclusions apply for mental or nervous disorders.  (DE 194-29 at 86-87.)

Plaintiff was unable to work "[Since] June . . . due to a criminal and civil court case"] was misguided and misunderstood (*Id.* at ¶117) versus whether the claimed disability was really due to mental health conditions expressly excluded from coverage; and, whether any of Plaintiff's businesses were actually operational after June 2014 (*Id.* at ¶167).

Considering the factual findings in Plaintiff's SSDI determination, and Defendant's expert evidence, along with the contradictions in the record regarding whether Plaintiff was working after the June 2014 search and seizure and his psychiatric treatment, there exist triable issues of fact as to whether Plaintiff is totally disabled under the Policy.  Notably, the SSDI determination Plaintiff relies upon does not opine as to whether his purported disability is a *permanent* total disability, and thus Plaintiff has not met his burden is establishing a permanent total disability.

Accordingly, should District Judge Brown disagree with the undersigned's recommendations regarding Defendant's entitlement to summary judgment based on recission, the policy never becoming effective, or Plaintiff's exclusion from coverage due to a pre-existing condition, the undersigned respectfully recommends that (1) both Plaintiff's and Defendant's motions for summary judgment as to whether Plaintiff has established a total disability be denied, and (2) Defendant's motion for summary judgment as to whether Plaintiff has established a permanent total disability be granted.

## G.  Plaintiff's Claim for Breach of the Implied Covenant of Good Faith

Both parties move for summary judgment on Plaintiff's claim for breach of the implied covenant of good faith and fair dealing.  It has long been the law that "an insurer is not liable in excess of the policy limits," *i.e.,* consequential damages, "for the breach of an insurance contract absent bad faith."  *Sunrise One, LLC v. Harleysville Ins. Co. of N.Y.*, 293 F. Supp. 3d 317, 328

44

(E.D.N.Y. 2018) (internal quotations and citations omitted) (citing cases). To establish bad faith, an insured must demonstrate that, under the given facts, no reasonable carrier would deny coverage. *Id.* (internal quotations and citations omitted); *see also Ebrahimian v. Nationwide Mut. Fire Ins. Co.*, 960 F. Supp. 2d 405, 416 (E.D.N.Y. 2013).

Plaintiff argues that Defendant breached their implied covenant of good faith and fair dealing by focusing on criminal charges filed against Plaintiff, unrelated to the case, and sought to penalize him for what he characterizes as "negligent omissions." (DE 196-1 at 23-24.) Plaintiff claims this was a violation of N.Y. Ins. Law § 2601, which states in part, "[n]o insurer doing business in this state shall engage in unfair claim settlement practices . . ." by "failing to adopt and implement reasonable standards for the prompt investigation of claims arising under its policies." (*Id.* at 22.) Plaintiff asserts that Defendant egregiously violated § 3216(d) of N.Y. Ins. Law by disregarding the limitations of defenses set forth therein when issuing its claim denials. (*Id.* at 23.) Defendant asserts that Plaintiff has already acknowledged that the Policy contains a conformity-with-statutes provision, and therefore the alleged statutory violations are irrelevant. (DE 197 at 23, citing DE 196 at 8-9.) Defendant further argues that Plaintiff has failed to show that no reasonable insurer would have denied coverage under the same circumstances, reiterating the applicable Policy exclusions, the non-covered "legal disabilities," and Plaintiff's failure to produce sufficient evidence to support a covered disability.[12] Plaintiff makes bald statements that Defendant "of course" cannot prove any fraud so Defendant instead

---

[12] Moreover, New York does not recognize a separate cause of action in tort for bad faith denial of insurance coverage, and a contractual claim for breach of the implied covenant of good faith and fair dealing is subject to dismissal where, as here, it is duplicative of plaintiff's breach of contract claim. *Sikarevich Fam. L.P. v. Nationwide Mut. Ins. Co.*, 30 F. Supp. 3d. 166, 170-71 (E.D.N.Y. 2014).

focused on the investigating Plaintiff's criminal conduct in hopes of finding an "out." (DE 198 at 10.)

The Court does not find the existence of any genuine issue of material fact as to Defendant's good faith in assessing Plaintiff's claims and denying coverage. Plaintiff himself acknowledges that he made misstatements and omissions in his application. (DE 196-1 at 13.) The Court finds Plaintiff's accusations that Defendant acted in bad faith are conclusory, and thus, Plaintiff fails to satisfy his burden of establishing bad faith, or, at minimum, creating an issue of material fact.

As for the punitive damages claims, the Court agrees with Defendant that such a claim should be dismissed because Plaintiff cannot show "egregious conduct" by Defendant that is both actionable as a tort independent of the alleged breach of contract, and directed not only at him, but "part of a pattern directed at the public generally." (DE 193-1 at 30 (citing *Sikarevich*, 30 F. Supp. 3d at 173-74; *Ebrahimian*, 906 F. Supp. 2d at 417-18).) Plaintiff does not address his punitive claims.

Accordingly, the undersigned respectfully recommends that Defendant's motion for summary judgment as to Plaintiff's breach of the implied covenant of good faith be granted, and that Plaintiff's motion for summary judgment thereof be denied, and that Defendant's motion for summary judgment dismissing Plaintiff's claim for punitive damages be granted.

## VI.   CONCLUSION

Based on the foregoing, the undersigned respectfully recommends that: (1) Defendant's motion for summary judgment be granted as to Defendant's recission claims, and that Plaintiff's motion for summary judgment as to those claims be denied; (2) Defendant's motion for summary judgment as to Defendant's claims that the Policy never became effective be granted; (3)

46

Defendant's motion for summary judgment excluding coverage due to a pre-existing condition be granted; (4) Defendant's motion for summary judgment as to fraud barring coverage as a matter of law be granted; and (5) Defendant's motion for summary judgment as to Plaintiff's breach of the implied covenant of good faith claim and punitive damages claim be granted, and that Plaintiff's motion for summary judgment as to the implied covenant of good faith claim be denied.  Should the District Court find that Defendant is not entitled to recission of the Policy, or that the Policy was effective and Plaintiff's coverage for pre-existing conditions was not excluded, the undersigned recommends that Defendant's motion to strike the SSDI determination be denied, and that Defendant's motion for summary judgment denying coverage on Plaintiff's failure to establish a permanent disability be denied, and Plaintiff's motion as to those claims be denied; and that Defendant's motion for summary judgment denying coverage on Plaintiff's failure to establish a permanent total disability be granted.

## VII.   OBJECTIONS

A copy of this Report and Recommendation is being electronically served on counsel for each of the parties.  Any written objections to this Report and Recommendation must be filed with the Clerk of the Court within fourteen (14) days of service of this Report. 28 U.S.C. § 636(b)(1) (2006 & Supp. V 2011); Fed. R. Civ. P. 6(a), 72(b). Any requests for an extension of time for filing objections must be directed to the district judge assigned to this action prior to the expiration of the fourteen (14) day period for filing objections. Failure to file objections within fourteen (14) days will preclude further review of this Report and Recommendation either by the District Court or the Court of Appeals. *Thomas v. Arn*, 474 U.S. 140, 145 (1985) ("a party shall file objections with the district court or else waive right to appeal"); *Caidor v. Onondaga Cnty.*, 517 F.3d 601, 604 (2d Cir. 2008) ("failure to object timely to a magistrate's report operates as a waiver of any

further judicial review of the magistrate's decision") (citation omitted); *see Monroe v. Hyundai of Manhattan & Westchester*, 372 F. App'x 147, 147–48 (2d Cir. 2010) (same).

Dated:  Central Islip, New York
        June 30, 2022

**Respectfully recommended:**

[S] *James M. Wicks*
    JAMES M. WICKS
United States Magistrate Judge